PEOPLE v GENERAL DYNAMICS LAND SYSTEMS, INC

Docket No. 88066. Submitted January 20, 1987, at Detroit. Decided March 20, 1989.

General Dynamics Land Systems, Inc., was charged with involuntary manslaughter and wilful violation of the Michigan Occupational Safety and Health Act. The charges arose after an employee of the defendant died from cardiac arrhythmia caused by exposure to Freon fumes from a battle tank he had been driving. Freon had been used to degrease the tank's exterior. The deceased had driven the tank in such a way that his head and shoulders had remained outside the tank's hatch cover. The district court dismissed the charges against defendant. The Macomb Circuit Court, Ray R. Cashen, J., affirmed. The people appealed by leave granted.

The Court of Appeals *held:*

1. The court did not err in dismissing the MIOSHA violation charge. The rule allegedly violated did not apply to the facts of the case.

2. The court erred in dismissing the involuntary manslaughter charge. A corporation may be guilty of the crime of manslaughter. The evidence on the issue of gross negligence was conflicting, creating a question for the jury.

Affirmed in part, reversed in part and remanded.

E. C. PENZIEN, J., dissented in part. He agreed with the majority that the court properly dismissed the charge of MIOSHA violation. He believed, however, that a corporation cannot be criminally liable at common law for involuntary manslaughter. He would affirm the dismissal of both charges.

HOMICIDE — MANSLAUGHTER — COMMON LAW — CORPORATIONS.

A corporation may be guilty of the crime of manslaughter.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Theodore S. Kli-*

REFERENCES

Am Jur 2d, Corporations § 2141; Homicide § 26.
Corporation's criminal liability for homicide. 45 ALR4th 1021.

*maszewski,* Assistant Attorney General, for the people.

*Michael H. Golde,* and *Butzel, Long, Gust, Klein & Van Zile, P.C.* (by *John P. Hancock, Jr.*), for defendant.

Before: Sullivan, P.J., and Gribbs and E. C. Penzien,* JJ.

Sullivan, P.J. Judge Penzien has laid out the facts in this matter, and they need not be recited here. We agree with his conclusion as to Count II, the MIOSHA count, which should have been dismissed. The manslaughter charge, however, is a different matter. He concludes that a corporation is not sufficiently a "person" to be the perpetrator of a manslaughter. As he correctly notes, the crime of manslaughter is not defined in our statutes but, rather, we are directed to use the common-law definition. *People v Richardson,* 409 Mich 126; 293 NW2d 332 (1980). Case law reveals, however, that the terms "of another" and "person" have been used interchangeably. For example, involuntary manslaughter is defined as the killing *of another* without malice and unintentionally. *Richardson, supra,* p 136, quoting *People v Ryczek,* 224 Mich 106, 110; 194 NW 609 (1923). Similarly, in *People v Carter,* 387 Mich 397, 418; 197 NW2d 57 (1972), manslaughter is defined as the unlawful killing *of another* without malice, express or implied.

By contrast, the definition applied in *People v Stubenvoll,* 62 Mich 329, 331; 28 NW 883 (1886), uses the term "person" instead of "another":

Any person who shall maim or injure any other

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

person . . . and if death ensue from such wounding or maiming, such person so offending shall be deemed guilty of the crime of manslaughter.

See also CJI 16:4:03 ("A person commits the crime of involuntary manslaughter if he kills an individual . . .").

So manslaughter may be defined in different ways, the killing of another or the killing of a person and the courts over the years have used either term.

Judge PENZIEN would limit himself to a definition in which the term "another" appears. However, if manslaughter may be defined in different ways, such as the killing of another or the killing of a person, and historically the courts have used either term, we do not believe that we should rely solely on a definition containing the term "another."

Our penal code defines "person," "accused," and similar words to include public and private corporations, unless a contrary intention appears. MCL 750.10; MSA 28.200. After examining the common-law definitions of manslaughter, we are unpersuaded that a contrary intention appears. Consequently, we cannot agree with the dissenting opinion in this respect and reach an opposite conclusion: that a corporation is sufficiently a "person" to be the perpetrator of a manslaughter.

In this case, the district court, affirmed by the circuit court, refused to bind defendant over on the manslaughter charge, finding insufficient evidence of gross negligence. On review, the magistrate's finding will be not disturbed unless there has been an abuse of discretion. *People v Talley,* 410 Mich 378, 385; 301 NW2d 809 (1981). Here, there was conflicting evidence on the issue of gross negligence which created a question of fact, properly

resolved by the trier of fact and not the magistrate. *People v Doss,* 406 Mich 90; 276 NW2d 9 (1979).

In addition, the district court found that Franklin Bryan, Chief of Engineering Services at the Prototype Fabrication Shop, reviewed the safety bulletins covering the procedure involved here with his supervisor and instituted a procedure for flushing the tanks. This testimony was contradicted, however, by two subordinate employees who testified that they had not seen any safety bulletins nor had they received any training regarding the use of Gensolv-D. Therefore, there was a conflict on the issues of whether there was ever a procedure instituted for safely cleaning out the tanks and whether the safety bulletins were ever reviewed.

Similarly, there was also a conflict regarding the testimony of Dr. Spitz as to the cause of death. At one time, Dr. Spitz held that Lee had had an allergic reaction to a nonlethal exposure of Freon. However, Dr. Conolly, a toxicologist, contradicted the entire idea that the victim could have died from an allergic reaction to a nonlethal exposure of Freon.

Also, and most importantly, there was a conflict in the testimony as to whether Dr. Spitz had undertaken procedures to insure that Freon did not escape from the body tissues. The procedures were crucial because, if the specimens were placed in baby food jars, as testified to by Sergeant Bourgeois, an undeterminable amount of Freon may have escaped, thereby opening to challenge the finding of a nonlethal dosage of Freon in the victim's body. Because of the conflict in the evidence, the district court should have bound the defendant over for trial on the charge of involuntary manslaughter.

Reversed as to Count I, manslaughter, and remanded for trial. Affirmed as to Count II.

Gribbs, J., concurred.

E. C. Penzien, J. *(dissenting in part).* The people appeal by leave granted from an order of the circuit court affirming the district court's refusal to bind over defendant on charges of involuntary manslaughter, MCL 750.321; MSA 28.553, and wilfully violating the Michigan Occupational Safety and Health Act (miosha), MCL 408.1011(a); MSA 17.50(11)(a) and MCL 408.1035(5); MSA 17.50(35)(5).

The charges arose out of an incident at defendant's Prototype Fabrication Shop in Center Line, Michigan, which resulted in the death of thirty-two-year-old driver/mechanic Harvey James Lee. The Prototype Fabrication Shop produces M-1 and M-60 main battle tanks for the United States Army. On November 15, 1983, Lee was driving one of the tanks inside when he was overcome by fumes from a cleaning solution, Gensolv-D, used to degrease the interior of the tanks. The medical examiner attributed Lee's death to cardiac arrhythmia caused by exposure to trichlorotrifluoroethane (Freon) fumes.[1]

Freon is used by defendant near the end of the manufacturing process to degrease the interior of the completed tank. The tank is taken outdoors and parked on an incline. Freon is then sprayed over all interior surfaces and allowed to drain from the tank overnight. Approximately fifteen

---

[1] It should be noted that the term "Freon" was used continually by witnesses at the preliminary examination. "Freon" is the trade name utilized by E. I. duPont de Nemours & Company for the chemical trichlorotrifluoroethane. The trichlorotrifluoroethane involved in this case was manfactured by Allied Chemical Company which sells this solvent under the trade name "Gensolv-D."

gallons of Freon were used to degrease the particular tank Lee drove. A subsequent simulation by the prosecution expert indicated that, although Freon is highly volatile, several gallons of the solvent remain in liquid form on the floor of the tank, even after the tank has sat overnight with all hatches open to provide maximum ventilation.

One of Lee's tasks was to drive degreased tanks, after they had sat overnight, to another part of the production facility. On the day in question, Lee climbed into the tank and positioned himself in such a manner that his head and shoulders remained outside the hatch cover. The engine was then started. The aforementioned simulation by the prosecution's expert indicated that solvent levels in the area of the operator's nose and mouth before starting the engine were in the range of five hundred parts per million. After starting the tank, the level rose to fifteen hundred parts per million.

In the particular tank Lee was driving an experimental nuclear, biological, chemical (NBC) system had been installed in the tank and wired to begin functioning as soon as the main engine was started. In a combat situation, the system would be hooked to protective suits worn by tank crewmen. In a noncombat setting, the system output hose was fastened to a fitting inside the tank, the effect of which was to pass air across the liquid Freon remaining on the tank floor. The expert's simulation indicated that, one minute after starting the tank, solvent levels in the area of the driver's mouth and nose rose to thirty thousand parts per million. A U.S. Department of Labor Occupational Safety and Health Administration material safety data sheet published in early 1983 indicated that Freon levels above one thousand parts per million could lead to light-headedness, giddiness, shortness of breath, possible narcosis,

and possible cardiac arrhythmias at high concentrations. Plant safety bulletins containing this information had been prepared by the safety director but given only limited circulation to upper level management.

Defense witnesses indicated that, in several years of using Freon as a solvent, the only problems experienced had been light-headedness, giddiness, and shortness of breath, all of which disappeared within minutes of exposure to fresh air, and none of which resulted in long-term effects. No one at General Dynamics expected that overexposure to Freon would lead to fatal consequences. A number of grievances had been filed against defendant in another area plant over the use of Freon and the accompanying problems of light-headedness and shortness of breath.

Wayne County Coroner Dr. Werner V. Spitz conducted the autopsy of Lee and listed the cause of death as cardiac arrhythmia triggered by exposure to Freon-113. The report also listed Lee's obesity as possibly contributing to the accident and death. At the preliminary examination, Spitz reiterated that Lee died from cardiac arrhythmia. Additionally, he testified that the victim had an allergic reaction to a nonlethal exposure of Freon, stating that the amount of Freon found in Lee's body tissues was only one-tenth of the lethal exposure. A second prosecution expert, a toxicologist, concluded that Spitz drew erroneous conclusions from tissue samples he took from Lee. Spitz found the levels of Freon in the tissue samples to be fairly low and from this inferred that the arrhythmia was the result of hypersensitivity. The toxicologist, however, disagreed stating that because Freon is highly volatile it tends to evaporate upon exposure to the atmosphere; therefore, tissue samples give no solid indicator of the level of exposure

and thus no clue to the sensitivity of the individual. The exposure may have been much higher than the tissue samples would indicate.

Following testimony given at the preliminary examination, the district court made its findings of fact and conclusions of law. The court found that defendant had reviewed the April, 1983, safety bulletins issued by the federal government and instituted the procedure for flushing out the tanks and that prior to November 15, 1983, the supervisors at defendant's Prototype Fabrication Shop held the good-faith belief that the procedure they were using was adequate to prevent death or serious harm to their employees. Further, the court found that the supervisory personnel did not know prior to November 15, 1983, that quantities of Freon would remain in the tank after flushing or that the NBC system would transmit fumes from the floor of the tank to the driver's breathing space. The district court found that Lee was hypersensitive or allergic to Freon and that he died from an allergic reaction to the Freon, not from asphyxiation.

The district court went on to dismiss the charges of involuntary manslaughter, citing four independent grounds: (1) defendant's good faith belief that it had established a safe procedure for the use of Freon in degreasing tanks at its Center Line facility, (2) prior to November 15, 1983, defendant had no knowledge that the flushing system used would combine with the experimental NBC system to produce a Freon-laden atmosphere outside of the driver's hatch, (3) defendant did not know or believe that an overexposure to Freon was likely to cause more than short-term dizziness, giddiness, nausea, or headaches, associated with occasional short-term loss of consciousness, and (4) the sequence of events would not have been fatal and

would not have caused serious harm but for the
hypersensitivity of Lee, which neither defendant
nor anyone else could have known, and that this
hypersensitivity combined with the procedures uti-
lized caused the death of Lee.

As for the charge that defendant wilfully vio-
lated MIOSHA by failing to ventilate the tank be-
fore Lee entered, the court dismissed the charge
stating that Lee had not entered the tank since his
head and shoulders were outside the tank while
driving and, further, that he was not breathing
within an enclosed space for five to ten minutes
before his distress.

The people appealed to the circuit court which
affirmed the dismissal of charges against defen-
dant. The circuit court found that the people failed
to show that it was apparent to the ordinary mind
that the use of Freon was likely to prove disas-
trous to another and that defendant had an estab-
lished procedure for tank cleaning which was con-
sidered effective to remove Freon and any result-
ing fumes. The circuit court stated that the estab-
lished procedure had been used numerous times
without serious harm to employees. Finally, the
circuit court found that, since the victim's head
and shoulders were outside of the tank, the victim
was not within an enclosed space as defined in
1979 AC, R 325.2410(f), thereby requiring dismissal
of Count II.

The people appeal by leave granted from the
circuit court's affirmance of the district court's
refusal to bind over defendant on charges of invol-
untary manslaughter and wilfully violating MIO-
SHA. I agree with the district court's dismissal but
in Count I for reasons other than those stated in
the district court's findings of fact and conclusions
of law.

In Count I of the complaint, defendant was

charged with involuntary manslaughter for the death of Harvey James Lee. MCL 750.321; MSA 28.553 provides:

> Any *person* who shall commit the crime of manslaughter shall be guilty of a felony punishable by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars or both, at the discretion of the court. [Emphasis added.]

The manslaughter statute does not define the offense but instead incorporates the common-law definition of manslaughter. *People v Richardson,* 409 Mich 126, 134, n 8; 293 NW2d 332 (1980). Under the common law, involuntary manslaughter is defined as the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty. See *People v Ryczek,* 224 Mich 106; 194 NW 609 (1923).

The initial question which needs to be decided by this Court, although not addressed below by either the district court or circuit court, is whether a corporation can be considered a "person" under MCL 750.321; MSA 28.553. I do not believe that a corporation is sufficiently a "person" to be the perpetrator of a manslaughter, thus, dismissal of Count I was appropriate.

Courts have long recognized the existence of two types of persons, juristic and natural, with "juristic" defined as an artificial entity created by the state, and the term "natural person" meaning all human beings. Anderson, *Corporate homicide: The stark realities of artificial beings and legal fictions,* 8 Pepperdine L Rev 367 (1981). Our penal code

defines "person" to include public and private corporations, *unless a contrary intention appears.* MCL 750.10; MSA 28.200. I believe such a contrary intention appears from examining the common-law definition of manslaughter.

As stated above, manslaughter is not defined by the statute. Instead, we are directed to use the common-law definition. Under the common-law definition describing involuntary manslaughter as the unintentional killing "of another," "another" must be given its ordinary meaning which is "additional, one more . . . . One of the same kind." American Heritage Dictionary, New College ed, pp 54-55 (1976). If homicide is the killing of a human being, "another" precludes a corporation from being the perpetrator of the homicide within the meaning of the manslaughter definition. Accord, *Commonwealth v Peoples Natural Gas Co,* see 102 Pittsb L J 348 (Pa Co, 1954), reported in Anno: *Corporation's criminal liability for homicide,* 45 ALR4th, 1021, 1029; *State v Pacific Powder Co,* 226 Or 502; 360 P2d 530 (1961). Contra, *People v Ebasco Services, Inc,* 77 Misc 2d 784; 354 NYS2d 807 (1974).

Other jurisdictions have examined their penal codes and come to an opposite conclusion, that corporations are "persons" for purposes of criminal responsibility. In *Granite Construction v Superior Court of Fresno,* 149 Cal App 3d 465; 197 Cal Rptr 3 (1983), the California Court of Appeals held that corporations may be prosecuted for manslaughter under existing California law as the penal code defines "person" to include corporations as well as natural persons, thus placing a corporation on equal footing with any individual in regard to liability for criminal prosecution. However, the California Penal Code does not define involuntary manslaughter as the killing of a human being by

another. I believe this distinction along with the language of MCL 750.10; MSA 28.200, "unless a contrary intention appears," supports my finding.

Some state legislatures have specifically addressed the above problem by clearly defining "person" to include both a juristic and natural person for criminal-law purposes. For example, the Kentucky legislature amended their penal code to define "persons" to include corporations. At the same time they included a specific section on corporate liability with commentary clearly showing that the legislature intended corporations be indicted for crimes, including homicide. See *Commonwealth v Fortner LP Gas Co, Inc,* 610 SW2d 941, 942 (Ky App, 1980). Likewise, the Pennsylvania legislature has codified corporate criminal liability. *Commonwealth v McIlwain School Bus Lines, Inc,* 283 Pa Super 3; 423 A2d 413 (1980).

Since our Legislature has not clearly expressed its intention to hold corporations criminally liable for homicide offenses such as involuntary manslaughter and I interpret the common-law definition of involuntary manslaughter as precluding corporate liability, I would affirm the district court's dismissal of Count I of the complaint.

Count II of the complaint charges defendant with wilfully violating MIOSHA by not properly ventilating the tank before Lee entered. Defendant was charged with specifically violating 1979 AC, R 325.2430 (Rule 30[1]) which provides:

> Before an unprotected person enters a process space, the atmosphere shall be thoroughly ventilated and tested to determine the presence of a respirable atmosphere. Precautions shall be taken to prevent the creation of nonrespirable atmosphere in the process space during the time that a person is inside.

1979 AC, R 325.2410(f) defines "process space" as being a tunnel, process equipment, shaft, or enclosed space.

Both the district and circuit courts found that, since Lee's head and shoulders were outside the tank, he was not within an enclosed space as defined in 1979 AC, R 325.2410(f). I agree.

The prosecution's own expert witness, James Novak, chief industrial hygienist of the Michigan Occupational Safety and Health Administration, testified that, under his interpretation of the relevant administrative rule, it was inapplicable to the situation in which the hatch cover remained open and the worker's head was above the level of the hatch cover and therefore outside the tank interior. We find such testimony dispositive. Further support for this finding is shown by the administrative rule's use of a condition precedent (entry into an enclosed space) before ventilation and testing of the atmosphere need occur.

In conclusion, I would affirm the district court's dismissal of a complaint charging defendant with involuntary manslaughter and wilfully violating a specific provision of MIOSHA. I interpret Michigan's manslaughter statute as excluding corporations from criminal responsibility since they are not "persons" within the meaning of the statute. Additionally, the specific administrative rule the people charged defendant with violating was inapplicable on the facts of this case. It is possible that other MIOSHA provisions might have been violated, however, the one selected was inapplicable to the instant situation.

I would affirm.