PEOPLE v SELWA

Docket No. 166663. Submitted March 16, 1995, at Lansing. Decided
December 1, 1995, at 9:00 A.M. Leave to appeal sought.

Laurie Selwa was charged in the Oakland Circuit Court with
negligent operation of a vehicle causing homicide, as a result of
her involvement in an automobile accident on December 27,
1990. The other driver involved, Heide Mielke, was 6½ months'
pregnant at the time of the accident. Mielke was thrown
against the steering wheel of her car by the impact. The fetus'
heart rate dropped to an abnormal level after the accident and
an emergency Caesarean section was performed to deliver the
baby. The baby's heart rate, respiratory effort, muscle tone,
reflex irritability, and color were virtually nonexistent for the
first fifteen minutes following its removal from the womb. The
medical personnel continued their resuscitative efforts. At the
fifteen-minute mark, a heart rate greater than zero but less
than one hundred beats a minute was detected. Five minutes
later, the rate was greater than one hundred. Twenty-five
minutes after the delivery, the baby made two or three gasping
respirations. The baby was placed on a respirator but, when
removed from it 2½ hours after the delivery, was determined
by a physician to have died. A certificate of live birth and a
death certificate were issued. The defendant sought to quash
the information, arguing that the baby was stillborn and could
not be considered a "person" for purposes of the statute prohib-
iting negligent operation of a vehicle causing homicide. The
circuit court, Robert L. Templin, J., agreed with the defendant
and granted her motion to quash the information. The prose-
cutor appealed.

The Court of Appeals *held*:

1. The district court did not abuse its discretion in binding
over the defendant for trial. The circuit court erred in quashing
the information.

2. There was sufficient evidence presented at the preliminary

REFERENCES

Am Jur 2d, Automobiles and Highway Traffic § 324; Death § 1;
Infants § 2.
See ALR Index under Automobiles and Highway Traffic; Birth;
Death and Death Actions; Vehicular Homicide.

examination that the child was "born alive." There was sufficient evidence of the "death of another" to support the charge. The statute requires the death of a "person." The statutory requirement of the "death of another" requires the death of a "person."

3. The benchmark for determining what constitutes death is the irreversible cessation of either respiratory and circulatory functions or brain functions. Because it is axiomatic that one who is not dead is alive and vice versa, the definition of death in the former and present Determination of Death Act, MCL 333.1021 *et seq.*; MSA 14.15(1021) *et seq.*; MCL 333.1031 *et seq.*; MSA 14.15(1031) *et seq.*, is as helpful as the definition of "live birth" in the Public Health Code in determining whether a child was "born alive" and, hence, is a "person." The statutory definition of "death" provides guidance in determining what constitutes being "alive" under the "born alive" rule. The definition of "life" that logically flows from the definition of "death" requires the absence of an irreversible cessation of circulatory and respiratory functions or brain functions.

4. A child is "born alive" and thus is a "person" under the statute prohibiting negligent operation of a vehicle causing homicide if, following expulsion or extraction from the mother, there is lacking an irreversible cessation of respiratory and circulatory functions or brain functions.

5. It would be inappropriate for the Court of Appeals to turn exclusively to the common law to interpret the term "person" under the statute prohibiting negligent operation of a vehicle causing homicide where relevant statutory language exists. The definition of "death" in the Determination of Death Act may be applied to determine if an infant was born alive, in other words, not born dead.

6. The finding in a prior Court of Appeals decision that to be a "person" within the protection of the statute prohibiting negligent operation of a vehicle causing homicide, it is necessary that a fetus be "born alive" and "exist independently of its mother's body" is dicta and need not be followed.

7. The necessity of medical intervention to revive or bring one to life does not preclude a finding that a person is born alive.

8. It is not necessary to articulate exactly what evidence suffices to demonstrate that one has been "born alive." Evidence has been presented in this case to support the position of both parties. Therefore, the circuit court erred in quashing the information.

Reversed and remanded.

HOLBROOK, JR., J., dissenting, stated that the defendant cannot be prosecuted under the statute prohibiting negligent operation of a vehicle causing homicide because the fetus was stillborn and resuscitative efforts were unsuccessful. Court of Appeals precedent finding that to be a "person" within the protection of the statute it is necessary that a fetus be "born alive" and "exist independently of its mother's body," and the common-law underpinnings of that case, are a proper guide in determining whether the fetus was "born alive." Where, as here, the Legislature has declined to define the prerequisites of personhood, it is the constitutional duty of the judiciary to apply extant common-law doctrine and, when the need arises, to modify the common law to reflect the posture of modern society. The prosecutor failed to prove the corpus delicti of negligent operation of a vehicle causing homicide because the fetus was not "born alive," as that phrase has developed under the common law. The stillborn fetus was never "alive" as that term is defined under the common law. An independently sustained life is not exhibited by forcing air into a fetus' lungs or by a heartbeat that is detectable but so weak that it fails to circulate the blood. To the extent that the common-law definition of "person" in the context of the statute prohibiting negligent operation of a vehicle causing homicide is ambiguous, the ambiguity must be resolved in favor of the defendant. The evidence at the preliminary examination was not sufficient as a matter of law to prove the corpus delicti of negligent operation of a vehicle causing homicide.

1. HOMICIDE — NEGLIGENT OPERATION OF VEHICLE CAUSING HOMICIDE — WORDS AND PHRASES — "PERSON."

One must be "born alive" in order to be a "person" entitled to protection under the statute prohibiting negligent operation of a vehicle causing homicide (MCL 750.324; MSA 28.556).

2. HOMICIDE — NEGLIGENT OPERATION OF VEHICLE CAUSING HOMICIDE — WORDS AND PHRASES — "DEATH."

Death, for purposes of the statute prohibiting negligent operation of a vehicle causing homicide, is the irreversible cessation of either respiratory and circulatory functions or brain functions (MCL 750.324; MSA 28.556).

3. WORDS AND PHRASES — "DEAD."

It is axiomatic that one who is not dead is alive and vice versa; if one is not born dead, one is born alive and vice versa; life requires the absence of an irreversible cessation of circulatory and respiratory functions or brain functions (MCL 333.1033[1]; MSA 14.15[1033][1]).

4. Words and Phrases — "Born Alive."

The necessity of medical intervention to revive or bring one to life does not preclude a finding that a person is born alive (MCL 333.1033[1][b]; MSA 14.15[1033][1][b]).

5. Homicide — Negligent Operation of Vehicle Causing Homicide — Words and Phrases — "Born Alive" — "Person."

A child is "born alive" and thus a "person" under the statute prohibiting negligent operation of a vehicle causing homicide if, following expulsion or extraction from the mother, there is lacking an irreversible cessation of respiratory and circulatory functions or brain functions (MCL 750.324; MSA 28.556).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Joyce F. Todd,* Chief, Appellate Division, and *Anica Letica,* Assistant Prosecuting Attorney, for the people.

*Stephen T. Rabaut,* for the defendant.

Before: Gribbs, P.J., and Holbrook, Jr., and Markman, JJ.

Markman, J. The prosecutor appeals an order granting defendant's motion to quash the information charging her with negligent operation of a vehicle causing homicide. MCL 750.324; MSA 28.556. We reverse.

The charges brought in this case resulted from an automobile accident that occurred on December 27, 1990, in the City of Royal Oak. In moderately snowy conditions, defendant's vehicle hit Heide Mielke's vehicle head-on while making a left turn. Although wearing a safety belt, Mielke was thrown against the steering wheel. At the time of the accident, Mielke was 6½ months' pregnant. Upon Mielke's arrival at the hospital, a fetal heart monitor was able to detect the baby's heart rate at one hundred beats a minute. Because a heart rate under 120 is considered abnormal for a fetus, an

emergency Caesarean section was performed to deliver the child.

At the preliminary hearing, Doctor Matthew Allswede testified that the baby was removed from the womb at approximately 11:00 P.M. The doctor testified that the child had virtually no muscle tone and that, in the brief time he was with the baby, it did not make any respiratory effort. He did not attempt to detect a heart rate. Doctor Allswede was unable to say whether there was any spontaneous respiration, heart rate, or brain-wave activity at the time the child was removed from the womb.

Doctor David DeWitte, the treating neonatologist, testified regarding the "Apgar" score used by delivery room personnel to assess the status of the child shortly after birth and to determine whether a child is in need of resuscitation. He stated that at one, five, and ten minutes following birth, the baby's Apgar score was zero, indicating that the baby's heart rate, respiratory effort, muscle tone, reflex irritability, and color were virtually nonexistent. At fifteen minutes, however, the baby's heart rate was detected to be greater than zero but under one hundred beats a minute. The Apgar score at that point was one. At twenty minutes, the baby had an Apgar score of two, with a heart rate greater than one hundred. The doctor further testified that at twenty-five minutes after delivery, the baby made two or three gasping respirations.

Doctor DeWitte further testified that when the baby arrived at the neonatal unit it was connected to a manually operated respirator. After arriving at the neonatal unit, the baby was placed on a mechanical respirator. The baby's heart rate was 119. Doctor DeWitte testified that a heart rate above one hundred does not call for further measures to raise the heartbeat. The child was re-

moved from the respirator at 1:30 A.M., 2½ hours after delivery. The death note prepared by the physician stated that the baby died at that time. A certificate of live birth and a death certificate were both issued.

On the basis of the testimony at the preliminary hearing, the district court bound defendant over for trial on the negligent homicide charge. Defendant brought a motion in the circuit court to quash the information. Defendant argued, citing *People v Guthrie,* 97 Mich App 226; 293 NW2d 775 (1980), that the baby was stillborn and could not be considered a "person" for the purposes of the statute. The circuit court agreed, stating that the child was "born dead."

The prosecutor argues that the district court did not abuse its discretion in binding over defendant for trial on a negligent homicide charge and that the circuit court thereby erred in quashing the information. The prosecutor claims that there was sufficient evidence presented at the preliminary examination that the child was "born alive" and that, having presented evidence regarding all elements of the statute, defendant was properly bound over. We agree.

In reviewing a district court's decision to bind over a defendant for trial, the circuit court may not substitute its judgment for that of the district court and may reverse only if it appears on the record that the district court abused its discretion. *People v Brannon,* 194 Mich App 121, 124; 486 NW2d 83 (1992). This Court generally applies the same standard on review as applied by the circuit court in reviewing a district court's decision to bind over a defendant. *People v Neal,* 201 Mich App 650, 654; 506 NW2d 618 (1993).

A defendant must be bound over for trial on the prosecutor's information if the evidence presented

at the preliminary examination establishes that a felony has been committed and there is probable cause to believe that the defendant was the perpetrator. MCL 766.13; MSA 28.931; *People v Woods,* 200 Mich App 283, 287; 504 NW2d 24 (1993). The prosecutor is not required to prove each element of the offense beyond a reasonable doubt. *Id.* at 288. However, there must be evidence regarding each element of the crime charged or evidence from which the elements may be inferred. *Brannon, supra* at 124. If the evidence conflicts or raises a reasonable doubt, the defendant should be bound over for resolution of the issue by the trier of fact. *People v Cotton,* 191 Mich App 377, 384; 478 NW2d 681 (1991); *Neal, supra* at 655.

Defendant was charged with negligent operation of a vehicle causing homicide, MCL 750.324; MSA 28.556. The statute reads:

> Any person who, by the operation of any vehicle upon any highway or upon any other property, public or private, at an immoderate rate of speed or in a careless, reckless or negligent manner, but not wilfully or wantonly, shall cause the death of another, shall be guilty of a misdemeanor, punishable by imprisonment in the state prison not more than 2 years or by a fine of not more than $2,000.00, or by both such fine and imprisonment.

The issue before us is whether sufficient evidence was presented to bind over defendant for trial on a charge of negligent homicide, more particularly whether there was sufficient evidence of the "death of another." The word "another" refers back to the word "person." *Guthrie, supra* at 229. Thus, we first address what constitutes being a "person" under the negligent homicide statute.

The statutory offense of negligent homicide is

included in the Penal Code. The statutory rule of construction provided in the Penal Code, MCL 750.2; MSA 28.192, states as follows:

> The rule that a penal statute is to be strictly construed shall not apply to this act or any of the provisions thereof. All provisions of this act shall be construed according to the fair import of their terms, to promote justice and to effect the objects of the law.

In *Guthrie, supra,* this Court determined that the negligent homicide statute, requiring the "death of another," could not be interpreted as including unborn viable fetuses as persons without usurping the traditional power of the Legislature to define criminal acts. This Court stated:

> The common-law rule, in effect when the statute was adopted in 1921, was that there could be no homicide without a living human being the victim. The killing of an unborn child was not a homicide at common law for the reason that the fetus was not considered a "person" or "a reasonable creature in being" before its birth. It was necessary that the child be "born alive" and exist independently of its mother's body before it could be considered a "person." [*Id.* at 229.]

This Court expressed its displeasure with the "born alive" rule but nevertheless found it controlling. *Id.*[1] We therefore apply the "born alive" rule

[1] The Court in *Guthrie* concluded that the rule was "outmoded, archaic and no longer serves a useful purpose" in light of modern medical practices, *id.* at 232, but that " 'whatever elasticity there may be in civil matters, it is a safe and necessary rule that criminal law should not be tampered with except by legislation.' " *Id.* at 233, quoting *In re Lamphere,* 61 Mich 105, 108; 27 NW 882 (1886). The applicability of *Guthrie's* holding, that in order to be a "person" under the negligent homicide statute one must be "born alive," is not contested by the parties and is not before this Court. However, we do share the concerns expressed in *Guthrie* about the rule.

in determining whether defendant should have been bound over for trial on a charge of negligent homicide, which requires the death of a "person."

The Legislature has defined both "live birth" and "death." "Live birth" is defined under MCL 333.2804(3); MSA 14.15(2804)(3) as follows:

"Live birth" means a term defined by departmental rule which shall conform as closely as possible to the definition of live birth recommended by the federal agency responsible for vital statistics.

The state's Office of Vital and Health Statistics has provided the following definition under 1981 AACS, R 325.3201(1)(d):

"Live birth" means the complete expulsion or extraction from a pregnant woman of a product of human conception which, after such expulsion or extraction, shows any evidence of life, whether or not the umbilical cord has been cut or the placenta is attached.

At the time the incident occurred in the present case, the Legislature had defined "death" in the Determination of Death Act, MCL 333.1021 *et seq.*; MSA 14.15(1021) *et seq.*, which, as quoted in *In re Rosebush,* 195 Mich App 675, 690-691; 491 NW2d 633 (1992),[2] provided in pertinent part:

"A person will be considered dead if in the announced opinion of a physician, based on ordinary standards of medical practice in the commu-

___

[2] In *Rosebush, supra,* this Court discussed the Determination of Death Act, MCL 333.1021 *et seq.*; MSA 14.15(1021) *et seq.*, in the context of the removal of life-support. The panel held that the act was not intended to prevent the removal of life-support until a patient had been declared brain dead but was intended only to determine when a person receiving life-sustaining treatment has died.

nity, there is the irreversible cessation of sponta-
neous respiratory and circulatory functions. If arti-
ficial means of support preclude a determination
that these functions have ceased, a person will be
considered dead if in the announced opinion of a
physician, based on ordinary standards of medical
practice in the community, there is the irrevers-
ible cessation of spontaneous brain functions.
Death will have occurred at the time when the
relevant functions ceased. [MCL 333.1021; MSA
14.15(1021).]

"Death is to be pronounced before artificial
means of supporting respiratory and circulatory
functions are terminated. [MCL 333.1022; MSA
14.15(1022).]

"The means of determining death in section 1
shall be used for all purposes in this state, includ-
ing the trials of civil and criminal cases. [MCL
333.1023; MSA 14.15(1023).]"

While both parties cite and do not appear to
dispute the applicability of the definition of
"death," they do not rely on the statutory defini-
tion of "death" at the time of the incident, but,
instead, rely on the definition provided in the
subsequently enacted Determination of Death Act
at MCL 333.1033; MSA 14.15(1033).[3] MCL
333.1033; MSA 14.15(1033) provides in pertinent
part:

(1) An individual who has sustained either of the
following is dead:
(a) Irreversible cessation of circulatory and respi-
ratory functions.
(b) Irreversible cessation of all functions of the
entire brain, including the brain stem.

While we believe that the statutory definition in

[3] 1992 PA 90, which became effective June 4, 1992, both repealed
MCL 333.1021-333.1024; MSA 14.15(1021)-14.15(1024) and enacted the
subsequent Determination of Death Act, MCL 333.1031 et seq.; MSA
14.15(1031) et seq.

effect at the time of the incident is more appropriately applied, *In re Fultz,* 211 Mich App 299, 309; 535 NW2d 590 (1995), we find that for purposes of what constitutes death, both versions clearly regard the irreversible cessation of either respiratory and circulatory functions or brain functions as the benchmark for determining death. Thus, in the instant case, our analysis holds true with respect to both versions.[4]

Because it is axiomatic that one who is not dead is alive and vice versa, we find that the definition of "death" becomes as equally helpful ·as the definition of "live birth" in determining whether a child was "born alive" and hence is a "person."[5] If one is not born dead, one is born alive and vice versa. Although the definitions of "death" and its counterpart "life" do not include the term "birth," i.e., the extraction or expulsion of the fetus, *Guthrie* has held that an unborn fetus is not a person under the negligent homicide statute. Thus, it is really the word "alive" that is the immediate subject of controversy.

Because we have two statutory definitions that may guide us in applying the "born alive" rule, or, in other words, in determining what constitutes a "person" under the negligent homicide statute, it becomes necessary to look more closely at the two definitions.

The definition of "live birth" promulgated by the

---

[4] We point out that we look to the statutory definition of "death" for guidance in interpreting and applying the "born alive" rule. The repeal of the former Determination of Death Act and enactment of the new Determination of Death Act did not involve any express change in the statutory offense of negligent operation of a vehicle causing homicide, MCL 750.324; MSA 28.556, nor a change in any term used in that statute.

[5] The dissent alleges that this axiom "may be relevant to the vast majority of questions regarding life and death" but is "inapposite to this case". *Post* at 461. We see no reason why this case should present so extraordinary an exception.

state's Office of Vital and Health Statistics, and incorporated by reference in the statutory definition of "live birth" under MCL 333.2804(3); MSA 14.15(2804)(3), first requires "the complete expulsion or extraction from a pregnant woman of a product of human conception," in other words, "birth." It then requires that, "after such expulsion of extraction, [the product of human conception] shows any evidence of life." Thus, applying this definition to the "born alive" rule, an infant, following birth, would have to show "some evidence of life" in order to be found to be "born alive" or a "person." However, to conclude that one is "alive" if there is present "some evidence of life" is a tautology and begs the question of what constitutes "life" or being "alive." Such a circular definition provides utterly no legal guidance to this Court.

We further note that the Legislature has provided for a relatively specific realm of application for the statutory definition of "live birth." The statutory definition of "live birth" is set forth in that part of the Public Health Code addressing vital records.

MCL 333.2801; MSA 14.15(2801) provides as follows:

> (1) For purposes of this part [vital records], the words and phrases defined in sections 2803 to 2805 [MCL 333.2803-333.2805; MSA 14.15(2803)-14.15(2805)] have the meanings ascribed to them in those sections.
>
> (2) In addition, article 1 [MCL 333.1101 *et seq.*; MSA 14.15(1101) *et seq.*] contains general definitions and principles of construction applicable to all articles in this code.

The definition of "live birth" is contained in MCL 333.2804(3); 14.15(2804)(3).

It thus becomes necessary to look further to determine what constitutes being "alive" under the "born alive" rule. The statutory definition of "death" provides that guidance. As we previously stated, if one is not "dead," one is "alive." Thus, the definition of "life" that logically flows from the definition of "death" requires the *absence* of an irreversible cessation of circulatory and respiratory functions or brain functions.

The Determination of Death Act provides no express limitation or, as with the definition of "live birth," any specific application expressly intended for the definition of "death." In fact, in the former Determination of Death Act, MCL 333.1021 *et seq.*; MSA 14.15(1021) *et seq.*, the Legislature provided that "[t]he means of determining death in section 1 shall be used for all purposes in this state, including the trials of civil and criminal cases." MCL 333.1023; MSA 14.15(1023).[6]

Given that the statutory definition of "live birth" provides virtually no guidance in the application of the "born alive" rule in a criminal context, and in light of the Legislature's specifically limited scope of application of the term "live birth," we find it appropriate and necessary to apply the definition of "life" logically flowing from the statutory definition of "death" in determining what constitutes a "person" under the negligent

---

[6] This language was not repeated in the subsequent Determination of Death Act. MCL 333.1031 *et seq.*; MSA 14.15(1031) *et seq.* However, the Legislature did not in any way limit the application of this statutory definition in the new act either. While there may be a number of reasons for the later exclusion of this provision, there is no affirmative indication of legislative intent to preclude application of this definition in a criminal context, or, as in the context of the definition of "live birth," to limit such application. In any event, we continue to believe that the original Determination of Death Act, which contained the broad application provisions, is controlling in the present case.

homicide statute.[7] Accordingly, a child is "born alive" and thus a "person" under the negligent homicide statute if, following expulsion or extraction from the mother, there is *lacking* an irreversible cessation of respiratory and circulatory functions or brain functions.

The dissent takes a different approach, looking only to judicial (or common) law for guidance in defining "person" under the negligent homicide statute. The dissent, relying on dicta in Guthrie, supra at 229, finds that "[t]o be a 'person' within the protection of the statute, it is necessary that a fetus be 'born alive' and 'exist independently of its mother's body.'" *Post* at 471. The dissent then adopts the discussion of the "born alive" rule in *Guthrie* as the prevailing common law.

The dissent is correct in its statement that absent any further pronouncement from the Legislature regarding this statutory term, we must look to common law for guidance. However, the Legislature has, in fact, addressed this issue. The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. *Farrington v Total Petroleum, Inc,* 442 Mich 201, 212; 501 NW2d 76 (1993). Although not contained in a glossary of definitions directly within the Penal Code, legislative direction is provided, as we have noted, in other applicable statutes that must be read in accord with the negligent homicide statute. *Feld v Robert & Charles Beauty Salon,* 174 Mich App 309, 317; 435 NW2d 474 (1989); *Crawford Co v Secretary of State,* 160 Mich App 88, 95; 408 NW2d 112 (1987).

The dissent disagrees that there is applicable

---

[7] The Court of Appeals of Wisconsin similarly applied a "live birth" and "death" dichotomy in *State v Cornelius,* 152 Wis App 2d 272; 448 NW2d 434 (1989). The court, *id.* at 277, n 1, noted that it must assume the legislature was aware of the effect of the statutory definition of "death" on a large number of laws dealing with death.

statutory language. First, the dissent finds the
definition of "live birth" to be inapplicable. While
we have noted that the Legislature's definition of
"death" is to be strongly preferred to its definition
of "live birth" for purposes of the negligent homi-
cide statute, we do not necessarily find the latter
definition to be "inapplicable."

The dissent then dispenses with the statutory
definition of "death," finding it to be "wholly
unhelpful given that a person must be alive before
the person can die." *Post* at 473. However, while
the dissent's philosophical observation here con-
cerning life and death is meritorious, it misses the
point of why we have applied this definition in the
first place. We are attempting to determine
whether the infant, after being extracted or ex-
pelled, hence "born," was "alive." Thus, it is ap-
propriate to apply the definition provided in the
Determination of Death Act to determine if an
infant was born alive, in other words, not born
dead. Given this direction by the Legislature, we
believe it is inappropriate for this Court to turn
exclusively to common law in interpreting the
term "person" under the negligent homicide stat-
ute.

The dissent would require us to apply the "born
alive" rule as discussed in *Guthrie,* finding the
panel's exposition to be the prevailing common-law
doctrine. In *Guthrie,* this Court held that an un-
born viable fetus was not a "person" for purposes
of the negligent homicide statute. The infant in
*Guthrie* was indisputably stillborn; in other words,
born dead. Thus, the question before the Court
simply was whether a fetus that was viable before
birth constituted a "person" under the negligent
homicide statute. The Court relied on the exis-
tence of the "born alive" rule for its decision. The
mere requirement that an infant be "born alive,"

whatever the specific definition of that term, alone answered the question before the Court. It was unnecessary for the panel specifically to address what constitutes being "born alive."

As a result, it is not surprising that *Guthrie* did not set forth any substantive discussion or analysis of the "born alive" rule.[8] The panel did not consider any statutory definitions of "life" or "death" to interpret the "born alive" rule. This makes sense only when it is considered that it was wholly unnecessary for *Guthrie* to determine what would satisfy the "born alive" rule. The language relied upon by the dissent therefore is dicta in the purest sense, both because it was logically unnecessary to the Court's decision and because the basis for the language was given virtually no independent consideration by the Court.

We further find difficulty in the application of the standard adopted by the dissent. It is unclear what it means to exhibit an "independent and separate existence" from the mother. We believe that its vagueness is susceptible to an interpretation—as indeed is accorded by the dissent in this case—that an infant was not "born alive" when in fact the Legislature would direct that it was. Accordingly, given the legislative direction regarding this issue and given our concerns with relying on the dicta contained in *Guthrie,* we decline to adopt the standard that the dissent believes was set forth in *Guthrie.*

---

[8] The Court instead noted in pertinent part:

> "In the United States the 'born alive' requirement has come to mean that the fetus be fully brought forth and establish an 'independent circulation' before it can be considered a human being. . . . 'Independent circulation' can be established by evidence of the fetus having breathed, but such proof usually is not conclusive in the absence of the evidence of life, such as crying." [*Guthrie, supra* at 230, quoting LaFave & Scott, Criminal Law, § 67, pp 530-531.]

In this opinion, we have looked for legislative guidance in interpreting what constitutes a "person" under the negligent homicide statute or, in *Guthrie's* terms, what constitutes being "born alive." The Legislature expressly provides that direction by defining "death." Unlike the dissent, we decline to stray from such legislative direction. In doing so, we give fair import to the term "person" under the negligent homicide statute and effect the objects of the law. MCL 750.2; MSA 28.192.

We now address the evidence presented at the preliminary examination to determine if sufficient evidence was presented to bind defendant over for trial.

Evidence presented at the preliminary examination revealed that after being removed from the womb, although not immediately following such removal, the baby had a heart rate and later made "gasping respirations." Dr. DeWitte testified that these gasping respirations or breaths were, in fact, something that the infant did on its own. Furthermore, although, according to Dr. DeWitte's testimony, an electroencephalograph (EEG) was not performed, it may be inferred from the evidence that there was some brain activity.[9] This evidence

---

[9] In *Cornelius, supra* at 278-279, the court stated:

We therefore turn to the second portion of the statute that states that cessation of brain activity is also an indicator of death. The medical testimony indicates that the infant's behavior, especially his attempt at respiration, are indicative of brain stem activity. Cornelius conceded this point at oral argument and instead took the position that the criteria for determining whether a child was born alive should include higher level brain functioning measurable by an EEG. As stated earlier, the legislature has made the determination that brain stem activity is sufficient to indicate "life" and, based on the uncontroverted medical testimony that brain stem activity existed, it was error to find the infant "brain dead" under sec. 146.71.

of spontaneous breathing and heartbeat coupled with an inference of brain activity could negate a finding of "death" as statutorily defined. While the neonatologist agreed that, at least for the first ten minutes after delivery, the child could have been considered stillborn, he later stated that at the point that the child had a normal heartbeat and had made spontaneous breaths, it was alive. Certificates of live birth and death were in fact both issued.

The dissent concludes that the child did not exhibit an "independent and separate existence" from its mother. However, we believe that, even under the standard adopted by the dissent, sufficient evidence was presented. The dissent concludes that the baby's heartbeat as well as the spontaneous respirations were "artificially induced and mechanically sustained." *Post* at 477. However, this is in part inconsistent with Dr. DeWitte's testimony that revealed that the spontaneous respirations were something that the infant did on her own. Furthermore, although the baby required mechanical assistance, that does not render a finding per se that no circulatory function existed.

We further note that the circuit court granted the motion to quash the information after determining the child was born dead and that, absent medical intervention, it would never have been revived. However, the statutory definition of death provides for "irreversible cessation" of bodily func-

Doctor Allswede testified that he did not know whether an EEG was conducted and he was not able to testify regarding whether there was any "spontaneous brain wave activity." Doctor DeWitte testified that an EEG was not conducted. Despite any further testimony by the doctors regarding brain functions, we believe, on the basis of the evidence presented, an inference of brain activity is proper in reviewing whether defendant was properly bound over for trial. Obviously, at trial, the prosecutor must prove beyond a reasonable doubt that the child was "born alive."

tions. The necessity of medical intervention to revive or bring one to life does not preclude a finding that a person is born alive. Otherwise, the use of the word "irreversible" becomes meaningless.

We acknowledge the extreme difficulty in the present case in deciding whether the defendant should have been bound over for trial. Of course, at trial, the prosecutor will be required to prove beyond a reasonable doubt that the child was born alive and was thus a "person" under the negligent homicide statute. However, at this stage in the proceedings, that is not required. It is unnecessary for us to articulate exactly what evidence suffices to demonstrate that one has been "born alive." Evidence has been presented to support the position of both parties. It is not the function of the district court to discharge the accused when the evidence is conflicting or raises a reasonable doubt with regard to guilt. Such questions are for the trier of fact. *People v Flowers,* 191 Mich App 169, 179; 477 NW2d 473 (1991); *People v Hill,* 433 Mich 464, 469; 446 NW2d 140 (1989). The prosecutor has shown some reasonable evidence supporting the element of "death of another [person]." Thus, the district court did not abuse its discretion in binding defendant over for trial, and the circuit court erred in quashing the information.[10]

---

[10] The dissent finds our decision "untenable, raising serious procedural due process questions," *post* at 477, because it is grounded upon the death of a person whose life was only brought into being through "herculean" resuscitative efforts. We do not quarrel with the dissent's characterization of what arguably occurred. However, where "herculean" efforts have, in fact, succeeded and thereby arguably brought into being a "person" for purposes of the negligent homicide statute, we believe that a magistrate must bind over the defendant. That doctors will engage in "herculean" efforts to preserve human life, and occasionally succeed in these efforts, is simply a risk that is undertaken by potential defendants in negligent homicide cases. The dissent provides utterly no authority for "procedural due process questions" arising from the present holding.

The establishment of elements for statutory criminal offenses is a decision for the Legislature. However, we note the arguable anomalies with the "born alive" rule in cases like this one. A person who is responsible for harm sufficient to cause the death of a fetus before its expulsion fares better than one who is responsible for what may be considered a lesser harm where such harm allows for the live birth of the fetus before its death.

Reversed and remanded for reinstatement of the charge of negligent operation of a vehicle causing homicide. We do not retain jurisdiction.

GRIBBS, P.J., concurred.

HOLBROOK, JR., J. *(dissenting)*. Because the fetus in this case was stillborn and resuscitative efforts were unsuccessful, defendant Selwa cannot be prosecuted under the statute prohibiting negligent operation of a vehicle causing homicide. Accordingly, I dissent.

I

A

The statute prohibiting negligent operation of a vehicle causing homicide, MCL 750.324; MSA 28.556, provides:

> Any person who, by the operation of any vehicle upon any highway or upon any other property, public or private, at an immoderate rate of speed or in a careless, reckless or negligent manner, but not wilfully or wantonly, shall cause the death of another, shall be guilty of a misdemeanor, punishable by imprisonment in the state prison not more than 2 years or by a fine of not more than $2,000.00, or by both such fine and imprisonment.

The Legislature has not defined the term "person" within the context of this statute, but the Penal Code defines the term generally to include,

> unless a contrary intention appears, public and private corporations, copartnerships, and unincorporated or voluntary associations. [MCL 750.10; MSA 28.200.]

In the absence of any further pronouncement from the Legislature regarding what connotes a "person" under the negligent homicide statute, we must look to the common-law definition of that term. Accord *People v General Dynamics Land Systems, Inc,* 175 Mich App 701, 702-703; 438 NW2d 359 (1989). Indeed, "[i]n construing a statute wherein a public offense has been declared in the general terms of the common law, without more particular definition, the courts generally refer to the common law for the particular acts constituting the offense." *People v Schmitt,* 275 Mich 575, 577; 267 NW 741 (1936).

In *People v Guthrie,* 97 Mich App 226, 229; 293 NW2d 775 (1980), this Court held that an unborn viable fetus is not a "person" for purposes of the negligent homicide statute because under the common law "there could be no homicide without a living human being the victim." To be a "person" within the protection of the statute, it is necessary that a fetus be "born alive" and "exist independently of its mother's body." *Id.* See also anno: *Proof of live birth in prosecution for killing newborn child,* 65 ALR3d 413, §§ 2, 4 (citing cases). Recognizing the need to construe the "born alive" rule as it has developed under the common law, the *Guthrie* panel relied on a respected criminal

law treatise as well as decisions from other juris-
dictions.[1] The *Guthrie* Court explained:

> "In the United States the 'born alive' require-
> ment has come to mean that the fetus be fully
> brought forth and establish an 'independent circu-
> lation' before it can be considered a human being.
> Proof of live birth and death by criminal agency
> are required beyond a reasonable doubt to sustain
> a homicide conviction. 'Independent circulation'
> can be established by evidence of the fetus having
> breathed, but such proof usually is not conclusive
> in the absence of the evidence of life, such as
> crying." [*Guthrie, supra* at 230, quoting LaFave &
> Scott, Criminal Law, § 67, pp 530-531.]

Thus, *Guthrie* and its common-law underpinnings
guide us in our determination of whether the
Mielke fetus was "born alive."

### B

The majority holds that the language in *Guthrie*
requiring a showing of an "independent and sepa-
rate existence" was dicta,[2] and that this Court is
constrained to interpret the "born alive" rule only
through express legislative pronouncements. I dis-
agree because the effect of such a holding is to

[1] See *Local 1064, RWDSU AFL-CIO v Ernst & Young,* 449 Mich 322,
332; 535 NW2d 187 (1995), where our Supreme Court stated:

> In the absence of a published opinion in this state, it is
> entirely appropriate and indeed necessary to look to the com-
> mon law as represented by other states' decisions, hornbooks,
> treatises, and journals to discern the scope of [the common
> law].

[2] The majority contradicts itself when it states that the *Guthrie*
panel's "independent and separate existence" language was dicta,
because, as correctly noted by the majority in its footnote 1, *ante* at
458, both parties consider *Guthrie* and its reiteration of the "born
alive" rule to be controlling.

deny the judiciary's role in development of the common law.

Const 1963, art 3, § 7 provides:

> The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.

Our Supreme Court has construed this constitutional provision to mean that the common law and statutory law remain in force unless "changed" by the judiciary or "amended or repealed" by the Legislature. *Myers v Genesee Co Auditor,* 375 Mich 1, 7; 133 NW2d 190 (1965). The common law is neither static nor immutable, but is adaptable to the constantly evolving condition and needs of society. *Myers, supra; Semmens v Floyd Rice Ford, Inc,* 1 Mich App 395, 399; 136 NW2d 704 (1965).

The Legislature has not seen fit to abrogate the "born alive" rule in the fifteen years since *Guthrie* and has not amended the negligent homicide statute to define the prerequisites of personhood. As a result of this legislative void, the majority chooses to analyze this issue by resort to the definition of "live birth" in the Public Health Code[3] and the Determination of Death Act.[4] I disagree, finding the former statute to be inapplicable to this criminal matter and the latter to be wholly unhelpful given that a person must be alive before the person can die.[5] We need not be left twisting in the wind, however, as the majority presumes, merely

---

[3] MCL 333.2804(3); MSA 14.15(2804)(3), incorporating 1981 AACS, R 325.3201(1)(d).

[4] MCL 333.1033; MSA 14.15(1033).

[5] The majority declares that "it is axiomatic that one who is not dead is alive and vice versa." *Ante* at 461. While this statement may be relevant to the vast majority of questions regarding life and death, it is inapposite to this case. Although there is no dispute that the Mielke fetus was alive in utero before impact, our focus under the

because the Legislature has not declared with any specificity when a fetus is "born alive." Quite to the contrary, where, as here, the Legislature declines to speak, it is the constitutional duty of the judiciary to apply extant common-law doctrine and, when the need arises, to modify the common law to reflect the posture of modern society.

II

Turning to the facts of this case, I find that the prosecutor failed to prove the corpus delicti of negligent homicide inasmuch as the Mielke fetus was not "born alive," as that phrase has developed under the common law.

A

The obstetrician who delivered Heide Mielke's twenty-nine week fetus described it as "very floppy" with no muscle tone and no respiratory effort. In the delivery room, each of the fetus' life signs—heart rate, respiratory effort, muscle tone, reflex irritability, and color—were measured at five-minute intervals and assigned an Apgar score of zero, one, or two. Thus, a perfect Apgar score would have been a total of ten. At one, five, and ten minutes after delivery, the fetus' score was zero on all five measures. During this period, resuscitative efforts were made by hospital personnel, including intubation and, shortly thereafter, a tracheotomy, manual respiration with one hundred percent oxygen, a blood transfusion, and placement of an intravenous line into the fetus' umbilical artery to provide antibiotics, other medi-

born alive rule is on the moments immediately following birth. To this end, the relevant axiom is: A "person" must be alive before the person can die. The majority's use of the Determination of Death Act places the proverbial cart before the horse.

cations, and nutrients. Through these efforts, at the fifteen-minute marks, a heart beat of between zero and one hundred beats a minute was detected, resulting in a total Apgar score of one. At twenty minutes, the heart beat had increased to over one hundred beats a minute, resulting in a total Apgar score of two. At twenty-five minutes, the fetus made two or three spontaneous respirations. The fetus was then taken to the neonatal intensive care unit and placed on a mechanical respirator. Despite these resuscitative efforts, the stillborn fetus exhibited no muscle tone or reflex irritability, no effective circulation, severe cyanosis, excessive blood acidity, and a low blood count. The fetus' heartbeat eventually disappeared and the respirator was disengaged. The death certificate indicated that death occurred 2½ hours after delivery.

Neonatologist DeWitte testified that the fetus could have been considered stillborn for the first fifteen minutes after delivery because no signs of life were present. On cross-examination, Dr. DeWitte testified:

*Q.* Doctor, what does the terminology stillborn birth mean? What does that mean, sir?

*A.* That means that the birth of an infant with no signs of life.

*Q.* Okay. Doctor, can you tell the Court based on your experience whether or not you have encountered situations where perhaps there was a stillborn birth, and through mechanical or physician assistance life signs were able to be brought into the infant child?

*A.* Yes.

*Q.* Has that occurred in your experiences?

*A.* Yes.

*Q.* Okay. So, that I understand, and more importantly the Court, there could be a stillborn birth,

and subsequent to that there could be signs of life;
is that correct?

*A.* Yes.

         \*   \*   \*

*Q.* As I understand your testimony, correct me if
I'm wrong, [the Mielke fetus' Apgar scores of one
and two points at fifteen and twenty minutes,
respectively, were] based upon the assistance of
the physicians who were in the delivery room; is
that correct?

*A.* Yes. A number of measures were being car-
ried out at that time.

         \*   \*   \*

*Q.* Would it be fair to say, doctor, that other
than through the assistance of the respirator and
other mechanical assistance, that [the fetus] did
not independently sustain her life?

*A.* Yes.

On redirect examination, Dr. DeWitte opined
that, when the gasping respirations were made at
the twenty-five-minute mark, the fetus was alive.
A certificate of live birth was issued because,
according to hospital policy, "if they have a heart
rate then we consider it a live birth." No electro-
encephalograph (EEG) was performed to determine
whether any brain activity was present, but the
fact that this procedure was not done is not unu-
sual under this type of circumstance.

**B**

The majority concludes that the Mielke fetus
was born alive because the "evidence of spontane-
ous breathing and heartbeat coupled with an infer-
ence of brain activity could negate a finding of
'death' as statutorily defined." *Ante,* at 467-468. I
disagree.

The stillborn fetus was never "alive" as that
term is defined under the common law. The fetus'

weak heartbeat at the fifteen-minute mark and two or three spontaneous respirations at the twenty-five-minute mark were artificially induced and mechanically sustained. Despite these resuscitative efforts, Dr. DeWitte opined that the fetus never sustained an *independent and separate existence* from the mother. An independently sustained life is not exhibited by forcing air into a fetus' lungs either manually or mechanically, or by a heartbeat that is detectable but so weak that it fails to circulate the blood. See *People v Flores,* 3 Cal App 4th 200, 203; 4 Cal Rptr 2d 120 (1992); *State v Green,* 245 Kan 398, 399-404; 781 P2d 678 (1989); *Lane v Commonwealth,* 219 Va 509; 248 SE2d 781 (1978).

To base a criminal prosecution on facts such as these—a stillborn fetus who takes two or three spontaneous respirations following twenty-five minutes of herculean resuscitative efforts, and whose brain activity must be *inferred*—is untenable, raising serious procedural due process questions. *Guthrie, supra* at 232. See also *Keeler v Superior Court of Amador Co,* 2 Cal 3d 619, 633-634; 470 P2d 617 (1970); *State v Trudell,* 243 Kan 29, 35-37; 755 P2d 511 (1988). To the extent that the common-law definition of "person" in the context of the negligent homicide statute is ambiguous, this Court must draw that ambiguity in favor of defendant. *People v Dempster,* 396 Mich 700, 715; 242 NW2d 381 (1976). The majority, however, has done the opposite.

The evidence presented at the preliminary examination was insufficient as a matter of law to prove the corpus delicti of negligent operation of a vehicle causing homicide. Accordingly, I would affirm the circuit court's decision to quash the information because the Mielke fetus was not born alive and hence no crime was committed.