# Richmond

JOHN EARL BOWIE. V. COMMONWEALTH OF VIRGINIA.

October 8, 1945.

Record No. 3011.

Present, All the Justices.

The opinion states the case.

*William W. Butzner* and *DuVal Q. Hicks, Jr.*, for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

The facts in this case present a sordid story of an illicit amour between a married man and a single woman, with all of the implications attached to such a relation. The man, John Earl Bowie, was indicted for the murder of the woman, Clara Olivia Spencer. On this indictment he was tried and the jury found him guilty of involuntary manslaughter, and fixed his punishment at five years in the penitentiary.

At the conclusion of the Commonwealth's evidence, the defendant moved to strike it on the ground that the *corpus delicti* had not been proven, particularly, in that it failed to show that the death of Miss Spencer was caused by a criminal agency. The defendant excepted to the action of the court in overruling his motion and rested his case without testifying or offering any evidence. Upon the return of the jury's verdict, he moved the court to set it aside upon the ground above stated and for misdirection of the jury by the court. After argument of counsel, this motion was overruled and judgment was entered in accordance with the verdict.

There are a number of assignments of error; but all of them are covered by the contention of the defendant that the evidence failed to establish a criminal agency as the means of the death of Miss Spencer, and, that therefore, the *corpus delicti* was not proven.

The deceased, Clara Olivia Spencer, was, on the date of her death, an unmarried girl, nineteen years of age. She lived with her parents at their home in Fredericksburg, Virginia. The defendant, Bowie, is a married man, having a wife and three children. He has the appearance of being

in his late twenties. He lived with his wife and children outside Fredericksburg, in Stafford county, Virginia, and owned and operated a shoe repair shop in Quantico, Virginia, about twenty miles north of Fredericksburg.

When Miss Spencer was about sixteen years of age, she became an employee of the defendant, working in his shoe shop. During this period, the defendant began to pay constant personal attention to her, and assumed a proprietary control over her. He denied her the privilege of association with other men. If she displeased him, he reprimanded her, and on several occasions he slapped or struck her. He gave her presents of jewelry from time to time.

About three months before her death, she went out with Raymond Fisher, an eighteen-year-old youth, and shortly thereafter, the defendant showed Fisher some bloody rags and said something to him about having beaten the deceased until her nose bled.

The defendant would drive, or escort by other means of transportation, Miss Spencer from Fredericksburg to and from her work and return with her each night. According to Miss Ellen Hockaday, who roomed at the decedent's home, he visited Miss Spencer "pretty much every night." For six or seven weeks preceding her death, he came to see her from two to four times a week, and frequently took her out. He made himself at home in her residence, taking some of his meals there and conducting himself as if he were a member of her family.

On Saturday, September 9, 1944, the day before the tragedy, Miss Spencer kept an engagement with a young man, Earl Embry, leaving her home at about seven p. m., and returning from a drive with him to Washington, D. C., at an early hour Sunday morning. Late that evening, the defendant went to the home of Miss Spencer and inquired for her. Not finding her there, he went out in search of her, inquiring for her at a place called "Baker's", on Highway Route 1, out of Fredericksburg. Not finding her there, at about ten-thirty or eleven o'clock p. m., he got in a car with R. M. Johnson and two girls who roomed at Miss

Spencer's home, and drove with them to a place called "Aquia Tavern", in Stafford county, still looking for Miss Spencer. During the course of this drive, he complained to one of the girls, Miss Hockaday, that Miss Spencer had worn a pair of shoes out of his shop that belonged to some other person, and stated that if he caught her out with somebody else, "he would see that she would not go out with anybody else." When they returned to Fredericksburg, the defendant got out of the car near the Spencer home, and the remaining members of the party drove off. The defendant then went back to her home and inquired for her again, and was told she was at the movies. He replied, "She is not at the movies now." He departed, but returned again to her home about midnight and stood in the hall, part of the time behind the front door, until approximately two o'clock a. m. waiting for her. Members of the household tried to get him to leave; but he refused to do so. Finally, after everyone in the house had retired, he left. Miss Spencer had not then returned from Washington.

On Sunday morning, September 10, 1944, and shortly after Miss Spencer's mother had begun her morning's housework, the defendant appeared at the house, greeted Mrs. Spencer, and turned on the radio. Mrs. Spencer then went into the room occupied by her daughter and Ellen Hockaday, and woke up her daughter, who got up and went in to see the defendant. Later, Miss Spencer came into the kitchen where her mother and Miss Alley, another roomer in the house, were, and whispered to her mother that she had been out the previous night with Embry. The defendant followed her in the kitchen and inquired "What are you whispering about?"

About ten o'clock a. m., Miss Spencer got in the automobile of the accused and he drove off with her. Shortly thereafter, as they were driving west on Route 3, in Spotsylvania county, he approached a car being driven in same direction by Sergeant Steve A. Dyszkiewicz, a resident of Fredericksburg for two years, who was accompanied by

his wife and infant child. Sergeant Dyszkiewicz testified that when the approaching car was about thirty feet behind him, he looked in the rear vision mirror of his car to see if it desired to pass. Both cars were then traveling between twenty-five and thirty miles an hour. As he looked, he saw the right-hand door of the defendant's car open, and what appeared to be a girl getting out on the running board of the defendant's car and putting one foot on the highway; that as the girl left the car the defendant increased his speed and pulled to the left to pass the car in front of him; and that he paid attention to the car and not to the body of Miss Spencer, which was thrown from the moving car to the highway. The sergeant holloed at the defendant as his car passed him. Receiving no attention from his calls, he blew his horn two or three times, and finally the defendant stopped his car about three hundred and forty-six feet up the road from where the body of the girl lay in the road. Both men got out of their cars and what then took place is described in the testimony of the sergeant, as follows:

"Q. When he got out of the car what did he do?

"A. He walked up to me and said, 'What is the matter?'

"Q. What did you reply?

"A. I told him to take the body.

"Q. What was his reply?

"A. He told me to take it.

"Q. What was your answer?

"A. I told him to get up there and take her up. His car was moving a little and he had not put it in gear and I went and put it in gear.

"Q. How far was his car moving?

"A. Just a little.

"Q. How far did it move, approximately?

"A. Four or five feet.

"Q. Did you see Mr. Bowie pick her up?

"A. No; he was about half-way down when I came up and helped him out.

"Q. Did you hear him call out to her?

"A.   Call out to who?
"Q.   Call out to the girl as he went back to pick her up?
"A.   What do you mean?
"Q.   I mean, did he holler out to her, 'Olivia,' or anything like that?
"A.   No, sir.
"Q.   How was he carrying her?
"A.   He picked her up and put her over his shoulder.
"Q.   Slung her over his shoulder?
"A.   Not exactly over his shoulder; kind of lying against him, and we carried her to the car.
"Q.   You helped him put her in the car?
"A.   Yes, sir.
"Q.   Where did you go then?
"A.   I followed him in.
"Q.   For what?
"A.   To be sure he took her to the hospital."

The car in which the defendant and Miss Spencer were traveling was a 1931 model Plymouth coupe. Its doors are hinged in front and open in the rear, swinging outwards towards the front. The defendant drove the car and Miss Spencer sat beside him on his right. The car was viewed by the jury. Its seat is only wide enough to accommodate two persons, with a very slight space between them.

The road was a two-lane, hard-surfaced highway. The tragedy occurred in front of the home of Mrs. Lydia Edwards. Immediately preceding its happening, Mrs. Edwards, who was on her back porch, heard a scream that "sounded as if someone was hurt or frightened," which came from the direction of the road. Mrs. Edwards testified that it was not a man's voice she heard. She rushed into her house and, finding her child safe, went out to the road. There she saw a man going towards the body of the girl, which was in the road. Directly opposite the driveway to another house, which is across the road from the Edwards' house, there were marks on the pavement which showed where the deceased's clothing had rubbed very hard against the tarvia of the road surface. About three feet from the center

of the white line in the middle of the highway, a distance of forty-six feet from the marks of the clothing in the road, there was a pool of blood on the surface of the road. Drops of blood from the pool were found up the road for a distance of three hundred and forty-six feet, the distance the defendant's car stopped from the point where the girl's body came to rest in the road.

The defendant, followed by Sergeant Dyszkiewicz, took the unconscious body of the girl to a hospital in Fredericksburg. While waiting for a report from Dr. Pratt, the defendant was questioned by a policeman. The defendant said, "She fell out of the car," and when Dr. Pratt reported that the girl was dying, he said, "Doctor, for God's sake can you not do something; I am in a terrible predicament." The defendant told Sergeant Chittum of the State Police Force, that "he did not know how she got out of the car; did not know she was even out until his attention was called to it by the driver of the car he was passing," and that "he then looked in his mirror and saw her body lying in the road back of him." He told another policeman "She either fell or jumped out of his car * * * that the door closed and that he did not hear it when it closed."

It appeared from the examination of Miss Spencer's body that her skull was fractured in three places and her body covered with abrasions. At the time of her death she had been pregnant for four or five weeks, and there was evidence that a criminal abortion had been attempted four or five days before September 10th. Her death resulted from multiple fractures of her skull.

What, under our decisions, constitutes the *corpus delicti* in a prosecution for the commission of a homicide has been stated in unequivocal language in *Nicholas v. Commonwealth*, 91 Va. 741, 21 S. E. 364, as follows:

"Where the criminal agency of the accused is to be established by circumstantial evidence, it can only be done by proving the circumstances. In every criminal prosecution there are two fundamental and essential facts to be established: First, that the party alleged to have been murdered

is dead; and, second, that the death was brought about by the criminal agency of another. The *corpus delicti* is a material fact to be established in every criminal prosecution. In *Smith* v. *Commonwealth*, 21 Gratt. (62 Va.) 809, this court says: 'The material fact in every criminal prosecution is the *corpus delicti*. *Proof of the charge* in criminal cases, involves the proof of two distinct propositions: First, that the act itself was done; and, secondly, that it was done by the person charged. In murder *the corpus delicti* has two components—death as the result, and the criminal agency of another as the means. It is only when the first (that is, death by criminal violence) has been proved either by direct evidence of witnesses *who have seen and identified the body*, or when proof of the death is so strong and intense as to produce the full assurance of moral certainty, that the other (the criminal agency) can be established by circumstantial evidence.' See also, *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.) 912.

"In 3 Greenleaf, sec. 30, the author says: 'The death and the identity of the body being established, it is necessary, in the next place, to prove that the deceased *came to his death by the unlawful act of another person.*' "

In *Terry* v. *Commonwealth*, 171 Va. 505, 198 S. E. 911, Mr. Justice Hudgins, adopting the language of the above case, said: "In every prosecution for the commission of a homicide the *corpus delicti* has two component parts; death as the result, and the criminal agency of another as the means."

See Volume 5, Digest of Va. and W. Va. Reports (Michie), Homicide, section 80 (2), for further cases and annotation.

"Direct evidence is not essential to prove the *corpus delicti* in any case. It may be proved as any other fact may be proved which is essential to establish the guilt of the accused, namely, by circumstantial evidence which produces 'the full assurance of moral certainty on the subject.' *Nicholas* v. *Commonwealth*, 91 Va. 741, at page 750, 21 S. E. 364, at page 367, and authorities therein cited." *Cochran* v.

*Commonwealth*, 122 Va. 801, 94 S. E. 329; *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136.

Death must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the existence of the criminal agency as the cause of the death and the identity of the agency may be established by circumstantial evidence.

An examination of the body of a dead person will not always disclose whether death was from natural causes or by means of violence. An investigation of the cause of death is, therefore, not limited to the mere appearance of the body. The circumstances surrounding the cause of death may be inquired into. They may or may not show that death was due to a criminal agency. They may or may not furnish a clue to the identity of the criminal agent. However, if death is shown to have resulted through a criminal agency, the *corpus delicti* is established. The identity of the guilty agent is an additional question for consideration.

In this case, the death and identity of the person alleged to have been murdered were fully proven. The evidence sufficiently shows that she came to her death as the result of violence, a fractured skull, received by reason of her exit from a moving automobile operated and controlled by the defendant. This having been proven, the criminal agency, if any, and the identity of the criminal agent, were left to be established by circumstantial evidence.

This brings us to a consideration of the evidence. We find a man with a wife and three children paying assiduous attention to a young female in his employ. He publicly resents her association with any other man, and utters threats against her if she does "go out with anybody else." His state of mind is highlighted by his conduct when he failed to find her at home on Saturday night. His actions indicated he knew or suspected she had gone out with another man. In the face of these circumstances, and when she had greatly displeased him, he took her for an automobile ride, and during that trip the results of his threats against her was fulfilled to the bitter end. While driving his car between

twenty-five and thirty miles an hour, its right-hand door was opened against the pressure of the air created by the speed of the car, and the body of his passenger was seen to depart from the car to the surface of the highway. At the moment of the exit of his passenger, the car was swerved to the left and its speed increased, all of which naturally accelerated the departure of its passenger and added to the violence with which her body came in contact with the hard-surfaced pavement.

The defendant's statement that the deceased, sitting beside him in the car, fell out of the car, and that he did not know that she had fallen out until his attention was called to it by the driver of the car he was passing is incredible. No explanation of that statement has been made, and the jury was warranted in believing it to be palpably false.

"In all cases of circumstantial evidence *the conduct of* the accused is always an important factor in the estimate of the weight of circumstances which point to his guilt. As is said by Mr. Starkie 'The connection between a man's conduct and his motives is almost one of a moral nature pointed out by experience. It is by their experience of such connections that juries are enabled to infer a man's motives from his acts, and also to infer what his conduct was from the motive by which he was known to be influenced.'" *Dean* v. *Commonwealth,* 32 Gratt. (73 Va.) 912, at page 923.

The attitude and conduct of this defendant, when Dyszkiewicz came up to him after the two cars were stopped, is inexplicable. Notwithstanding his statement to a police officer that he had seen the body of the deceased lying in the road as he looked in his mirror as he was passing the sergeant's car, his first statement was an unconcerned, "What is the matter?" He argued with the sergeant as to who should remove the body. He showed no interest, sorrow, grief, nor anxiety for the deceased. It was only when he was subsequently informed that Miss Spencer would live but a few moments, that he expressed any interest in her, and that was

based on his apparent realization that he was in a "terrible predicament."

The flight of the defendant from the scene of the crime without any effort to ascertain the extent of Miss Spencer's injuries or to give her help, while not measuring up to the standard of presumptive evidence of guilt, was evidence tending to show guilt, which the jury had the right to consider and weigh as they deemed proper in connection with the other pertinent facts and circumstances of the case. *Anderson* v. *Commonwealth*, 100 Va. 860, 42 S. E. 865; *Jenkins* v. *Commonwealth*, 132 Va. 692, 111 S. E. 101, 25 A. L. R. 882; *Chandler* v. *Commonwealth*, 135 Va. 486, 115 S. E. 703; *Duty* v. *Commonwealth*, 137 Va. 759, 119 S. E. 62; 22 C. J. S., Criminal Law, sec. 625; 20 Am. Jur., Evidence, sec. 293.

The defendant's lack of sympathy and interest for Miss Spencer and his total indifference to her fate after his car was stopped weaken any suggestion that he was free of blame for the injuries inflicted upon her. *Johnson* v. *Commonwealth*, 165 Va. 834, 183 S. E. 577.

■ The jury was fully, fairly, and correctly instructed on every phase of the case. The trial court did not err in refusing to give instructions asked for by the defendant, based on the theory that no *corpus delicti* was proven, nor others which were already covered in instructions given.

■ "Recklessness itself may establish involuntary manslaughter, and when we add to it a carelessness so gross as to indicate a callous disregard of human life, liability is too plain for argument. When these facts have been established beyond a reasonable doubt and to the satisfaction of the jury, plainly there should be a verdict of guilty." *Albert* v. *Commonwealth*, 181 Va. 894, 27 S. E. (2d) 177; *Bell* v. *Commonwealth*, 170 Va. 597, 195 S. E. 675.

The cumulative facts and circumstances showed a reckless or indifferent disregard for human life. The effect of the action of the defendant in swerving his car and increasing his speed instead of applying his brakes and slackening his speed at the time of the exit of Miss Spencer from his car

was to make more certain the violent effect of her contact with the road surface. Under facts which must have been known to the defendant, this was culpable and criminal, and there was more than the lack of ordinary care and precaution.

With the facts in mind, considering every natural and reasonable inference therefrom, and reviewing the case from every angle, we can find no escape from the conclusion that, at the least, the death of Miss Spencer resulted from the wanton or wilful negligence of the defendant. The jurors weighed the evidence and so found. The trial judge, who heard the witnesses testify and conducted the trial, has approved their verdict, and in his written opinion has said, not without good reason, "There is ample evidence to support a verdict for a higher degree of homicide than involuntary manslaughter."

▋ The evidence connecting the accused with the homicide is almost wholly circumstantial; but as to time, place, motive, means, and conduct, it concurs in pointing out the accused as the perpetrator of the crime. It is wholly inconsistent with his innocence, and fully consistent with his guilt. He has had a fair trial, has been defended by able counsel, has had the benefit of all the safeguards which the law throws around an accused, and there is no sound principle upon which we can disturb the verdict and judgment based thereon. The judgment of the trial court is affirmed.

*Affirmed.*