Richmond

## HELEN E. LANE
### v.
## COMMONWEALTH OF VIRGINIA

November 22, 1978.

Record No. 771830.

Present: All the Justices.

*Stephen C. Swain; Frederick T Stant, Jr. ( Clark, Hofheimer & Stant, P.C.,* on brief), for appellant.

*Robert H. Herring, Jr., Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

PER CURIAM.

Defendant, Helen Elayne Lane, was tried by a jury on an indictment charging her with murder of her newborn child. She was convicted of involuntary manslaughter, and in accordance with the jury's verdict was sentenced to confinement in the State penitentiary for a period of five years.

Defendant contends that the evidence was insufficient to show that the child's death was caused by any criminal agency and that the trial court's instruction defining involuntary manslaughter was an improper statement of law.

The evidence shows that the defendant, who was 17 years of age and was to be married at home plate in a public ceremony in Metropolitan Park before a baseball game on May 9, 1976, was at home alone on May 8, 1976, when she began to suffer stomach pains. She associated the pains with constipation for which she had recently been treated. She decided to take a hot bath and, while soaking in the tub, felt the urge to use the toilet. While seated on the toilet seat, a "white bubble" emerged from her vagina and burst. Defendant then looked down and saw a baby's head protruding from her body. She moved to the edge of the toilet seat, and as the delivery process continued she removed the baby and cradled it as it came out. She noticed that the baby did not cry, was not

breathing, did not move or open its eyes, and that it began turning bluish-purple. In an attempt to induce breathing, she turned the child up and spanked it on its bottom as she had seen this done on television, but the child did not respond. She then wrapped the infant in a towel, along with the placenta, which was still attached to the infant by the umbilical cord and laid it on her bed. Defendant then returned to the bathroom to clean herself and the bathroom. After accomplishing this, she placed the blood-soaked towels and a bath mat in a garbage pail. She then put the garbage pail with its contents and the baby into a large plastic garbage bag and tied it at the top.

As defendant was taking the garbage bag out of the house, her brother and mother arrived. When the brother asked defendant what was in the bag, she gave an evasive answer. Defendant placed the bag in her car and drove to Old Wolfsnare Road in Virginia Beach where she placed the bag under some trees off the side of the road.

The next day, defendant was married and she and her husband left on a short wedding trip. Presumably, the defendant did not tell anyone about the occurrences of the afternoon before.

On May 11, 1976 a 15-year-old boy discovered a green plastic garbage bag off the side of Old Wolfsnare Road. He punctured the bag with a long pole and the body of an infant, towels and a plastic pail fell out. The police were summoned. The name "Summerell", defendant's surname before marriage, was on one of the towels found at the scene. This led the police to the home of defendant's parents where defendant resided. At the defendant's home the police also found a distinctive piece of wrapping paper in an open garbage bag which matched the paper included in the contents of the green plastic bag found at the scene.

When the defendant and her husband returned from their trip, she was arrested and advised of her rights. At first, she denied knowing anything about the green garbage bag and its contents. Finally, defendant admitted that she gave birth to the baby in the bathroom of her parents' home on May 8; that the birth came as a shock because she did not know that she was pregnant until that

time; that the child showed no signs of life; and that when she placed the garbage bag off the side of the road, she waited about five minutes to see if the baby was still alive.

At trial, the Commonwealth produced four medical expert witnesses, including Dr. Charles Springate, a forensic pathologist, who performed the autopsy; Dr. N. Turner Gray, a pediatrician and regional medical examiner, who examined the infant at the scene where it was found; and two obstetricians/gynecologists, Drs. D. L. Sarrett and L. L. Wasserman, Jr.

The medical testimony was lengthy and detailed. The child, described as being twenty inches long and weighing seven pounds, was considered to be a full-term baby. There were no signs of violence, no congenital defects or abnormalities, and no obstructions of the breathing passages. The lungs were aerated, and three cubic centimeters of air were found in the infant's stomach. When the body was found it had not decomposed, indicating that an insufficient amount of microscopic organisms or bacteria had been ingested during respiration. The existence of a large quantity of meconium (a stool characteristic of newborn infants) which was passed after birth, and evidence of air in the child's lungs and stomach were the bases of the doctors' opinions that the infant took several breaths and that the child was born alive. However, none of the doctors testifying on behalf of the Commonwealth expressed an opinion how long the baby lived. Dr. Springate testified that babies were known to gasp or take in a few breaths of air and then stop breathing immediately after birth. Dr. Sarrett stated on cross-examination that to say the child died after being placed in the plastic bag would be pure speculation. All the doctors were of the opinion that death resulted from anoxia, a severe lack of oxygen, but they could not state the cause of death with any reasonable degree of medical certainty. There was no testimony that the child would have lived on its own and apart from its mother under the existing conditions of its birth.

Dr. Wasserman testified that some women do not realize that they are pregnant until birth, and that he had known women who maintained that they didn't know they were pregnant at any time during pregnancy until labor commenced. When birth occurs under such conditions, the woman is "appalled and terribly frightened."

The defense called two medical experts, Dr. F. B. Presswalla, who at the time of the trial was Virginia's Deputy Chief Medical Examiner, and Dr. D. A. Lawrence, the defendant's physician. Dr. Presswalla testified that in his opinion the child was born alive, but did not survive for any length of time; and that it did not survive for more than a few minutes at the most which was evidenced by the fact that there was no decomposition attributable to micro-organisms entering the infant's system during respiration. Dr. Presswalla was likewise unable to state with any reasonable degree of medical certainty the cause of death.

Dr. Lawrence testified that his records show he first saw the defendant for a weight problem in 1974 when she weighed 172 1/2 pounds. On a return visit in February 1975, she weighed 159 pounds. Dr. Lawrence saw defendant again in February 1976, when she was complaining of lower back pains and frequency of urination. Defendant again visited Dr. Lawrence on March 3, 1976, complaining of constipation and a shoulder rash. She weighed 170 pounds at the time of this visit. When he asked defendant if she could be pregnant, she replied no. Dr. Lawrence stated that he examined defendant's pelvic area, vagina, cervix, and ovaries on the March 3 visit and he noticed some abdominal swelling, which was gone when defendant returned two weeks later for a follow-up visit. At the follow-up visit on March 18, defendant indicated to Dr. Lawrence that she had experienced her regular menstrual cycle in February and on March 10. Dr. Lawrence said that on defendant's last visit in April 1976, she told him that she was going to be married soon. He prescribed birth control pills for the defendant and told her that they could cause weight gain and swelling as well as nausea and cramps. Dr. Lawrence said that at no time during

these visits did he determine that the defendant was pregnant, nor did he ever tell her that she was not pregnant. Based on defendant's representations that she could not possibly be pregnant, Dr. Lawrence stated that he did not conduct a pregnancy examination.

Defendant argues that the Commonwealth's evidence was insufficient to show that the child's death resulted from any criminal act committed by her.

It is essential in every prosecution for the commission of a homicide that the Commonwealth prove the *corpus delicti*. In such cases there must be a showing of death and that death resulted from the criminal act or agency of another. *Opanowich v. Commonwealth,* 196 Va. 342, 355, 83 S.E.2d 432, 439-40 (1954). Direct evidence is not essential to prove the *corpus delicti*. It may be proved by circumstantial evidence. *Bowie* v. *Commonwealth,* 184 Va. 381, 390, 35 S.E.2d 345, 349 (1945); *Cochran* v. *Commonwealth,* 122 Va. 801, 817, 94 S.E. 329, 333 (1917).

The precise question presented here has not been decided by us. However, the traditional and prevailing view expressed by courts from other jurisdictions is that in a prosecution for killing a newly born baby, it is incumbent upon the State to prove that the child was born alive and had an independent and separate existence apart from its mother, and that the accused was the criminal agent causing the infant's death. *White* v. *State*, 238 Ga. 224, 232 S.E.2d 57 (1977). *See Jackson* v. *Commonwealth*, 265 Ky. 295, 96 S.W.2d 1014 (1936); *People v. Haynor,* 300 N.Y. 171, 90 N.E.2d 23 (1949); *State* v. *Collington,* 259 S.C. 446, 192 S.E.2d 856, 65 A.L.R.3d 407 (1972). *See also* Annot., "Proof of Live Birth in Prosecution for Killing Newborn Child" 65 A.L.R.3d 413, 415 § 2, 416 § 3, and 417 § 4 (1975), and other cases there cited. *Contra, Singleton* v. *State*, 33 Ala. App. 536, 35 So.2d 375 (1948); *People* v. *Chavez,* 77 Cal. App. 2d 621, 176 P.2d 92 (1947).

In the present case, all the medical opinion evidence showed that the child had air in its lungs and stomach and had passed a large quantity of meconium and that it was born alive. However, the medical testimony presented by the Commonwealth showed that the child breathed only a few times. The medical testimony presented by defendant showed that the child was alive only for a short time, not more than a few minutes at most, as evidenced by

the fact that there was no decomposition attributable to micro-organisms entering the infant's system during respiration. There was no evidence that the child ever achieved an independent and separate existence apart from its mother. The medical evidence showing that the child breathed a few times after birth is not an unqualified opinion that the child had acquired an independent existence separate from its mother. *Shedd* v. *State*, 178 Ga. 653, 654, 173 S.E. 847, 848 (1934).

Here the evidence shows that death resulted from anoxia (lack of oxygen), but the expert medical witnesses were unable to state the cause of death. It cannot be inferred from the evidence that the death was caused by wrapping the child in a towel or placing it in the plastic bag. To hold that the child's death was caused by the criminal act or acts of the defendant would be contrary to the medical evidence and amount to pure speculation and surmise. The defendant's statement that she waited about five minutes at the side of the road to see if the child was still alive does not support the inference that the child was breathing when she placed it in the bag in light of her next preceding answer to the officer's question that the child did not breathe after it was removed from her body. The verdict of the jury in this case is based on no more than a possibility that the child had an existence independent and separate from its mother and that the cause of death was the criminal act of the defendant.

We hold that the evidence was insufficient to show beyond a reasonable doubt that the child's death was caused by a criminal act of the defendant and that the *corpus delicti* had not been proved.

For the reasons stated, we do not reach defendant's contention that the instruction defining involuntary manslaughter was erroneous.

Accordingly, the judgment of conviction is reversed and the case is remanded.

*Reversed and remanded.*