*660 BENTON, J.,
dissenting.
I agree with the majority that this Court has the power to consider the additional issues presented by the appellant. We have jurisdiction of the case, and the issue was raised before the case was submitted for decision. I dissent, however, from the rulings that the trial judge did not err in failing to suppress the confession and that the evidence was sufficient to prove the corpus delicti.
I.
“[Cjustodial interrogation ... mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any meaningful way.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In determining whether the interrogation was custodial, “the only relevant inquiry is how a reasonable man in the suspect’s position would have understood his situation.” Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).
A reasonable person in Kuturah Aldridge’s situation would have understood that she was “in custody” when police questioned her. Indeed, the record contains very little that suggests Aldridge was not in custody. The record proved that two police officers employed by a state university went to Aldridge’s dormitory and informed Aldridge and her roommate “that a Norfolk detective would like to speak to them ... at the Norfolk Police Operations Center.” The university police officer did not tell the students that they did not have to go or that they could go without being escorted. Instead, he “informed them, would you mind coming down, coming with us to take you down there?” The officers did not transport the girls in the same vehicle; they took Aldridge in one vehicle and her roommate in another. These arrangements suggest circumstances indicating custody and a need for security.
The record clearly demonstrated that early on, Aldridge was a suspect in the baby’s possible homicide and that the police were preparing for her interrogation. At the police *661 operations center, Detective Huffman, who had investigated the discovery of the baby’s body and learned Aldridge had rented the storage unit, met the university police. Detective Huffman told Aldridge and her roommate that he and Detective Newman “wanted to speak to them.” The two detectives took the students through a side door into a secure part of the building not accessible to the public, where they again separated them. They put Aldridge in a room alone, closed the door, and did not tell her she could leave or that she was not under arrest. Indeed, suggesting she could not leave, they told her “she couldn’t just walk about freely because it was a secured facility ... but that she could ... knock and ... ask ... [for] anything that she needed.” The detectives told her they would “be there to talk ... in a short period of time” and exited the room.
After thirty-eight minutes, Detectives- Huffman and Newman entered the room and for the first time told Aldridge why she had been detained. They “began to advise ... Aldridge of what [they] had been doing that day regarding the storage unit and [their] discovery.” The detectives recalled telling her in some fashion that they “wanted to talk to her about this but she didn’t have to talk to [them] if she didn’t want to.” Detective Huffman testified he was “speculating” about what he said because he could not recall the precise words he used. He did not recall telling Aldridge she was free to leave. He did clearly recall, however, that they interrogated Aldridge about these events and failed to give her Miranda warnings during the first thirty-two minutes of questioning. The interrogation was not recorded.
I would hold that this evidence proved Aldridge did not voluntarily go to the interrogation. Instead, the university police officers delivered her to the Norfolk detectives after she acquiesced to the uniformed police officer’s direction to accompany him. She was not told that she could refuse to go; she was not told she was not being detained. When the university police delivered her to the detectives, the detectives likewise did not tell her she was not being detained or that she was free to leave. Indeed, the detectives explicitly told her she *662 could not leave. For thirty-eight minutes prior to the beginning of the interrogation Aldridge remained in a confined room within a secured area of the police operations center. I would hold that, under these facts, a reasonable person would understand herself to be in custody and deprived of her freedom of action. Thus, I would hold that the trial judge erred in failing to suppress Aldridge’s pre-warning statements.
I would further hold that the interrogation tactic the detectives used in Aldridge’s case, known as the “question first” technique, made the Miranda warnings ineffective, and, thus, the trial judge erred in failing to suppress her post-warning confession.
The United States Supreme Court held in Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, that “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” A person in police custody “must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney.” Id. To implement these protections of the Fifth Amendment, the Supreme Court explained in Miranda, that the ‘Voluntariness doctrine ... encompasses all interrogation practices which are likely to exert such pressure on an individual as to disable him from making a free and rational choice.” 384 U.S. at 464-65, 86 S.Ct. at 1623.
Recently the Supreme Court examined the constitutionality of this “question first” interrogation practice, which Detective Huffman describes as “standard procedure,” and rejected it as a violation of the Miranda doctrine.
This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of Miranda v. Arizona, 384 U.S. 436, 86 *663 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the interrogating officer follows it with Miranda warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with Miranda’s constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible.
Missouri v. Seibert, — U.S.-,-, 124 S.Ct. 2601, 2605, 159 L.Ed.2d 643 (2004).
The “question first” technique makes Miranda warnings ineffective, because when the “warnings are inserted in the midst of a coordinated and continuing interrogation, they are likely to mislead and ‘deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.’ ” Id. at-, 124 S.Ct. at 2611 (quoting Moran v. Burbine, 475 U.S. 412, 424, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986)). The Court expressly held in Seibert that the object of the “standard procedure,” which the detectives used in this case, “is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.” Id. at -, 124 S.Ct. at 2610. The unlawfulness of the “question first” technique was as evident here as it was in Seibert, where the following occurred:
[T]he facts here, ... by any objective measure^] reveal a police strategy adapted to undermine the Miranda warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that anything [the accused] *664 said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way [the] Officer ... set the scene by saying “we’ve been talking for a little while about what happened on Wednesday the twelfth, haven’t we?” ... The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect’s shoes would not have understood them to convey a message that she retained a choice about continuing to talk.
Id. at---, 124 S.Ct. at 2612-13 (footnotes omitted).
The similarities between Aldridge’s case and Seibert are obvious. The detective’s decision not to inform Aldridge of her Miranda rights was purposeful. Detective Huffman testified that their “standard procedure” was to question persons, secure information, give Miranda warnings, and then reduce the information to writing. Detective Huffman testified that during this unwarned interrogation Aldridge admitted delivering the baby, told the detectives that the baby was “stillborn and not alive,” and explained her actions. After thirty minutes of unwarned interrogation, they left Aldridge in the room alone. “She was distraught.” Forty minutes later, they reentered the room, gave her Miranda warnings, and continued the interrogation. The detective testified that after Aldridge signed the form indicating she had received Miranda rights and wished to waive her Miranda rights, Aldridge said *665 she wanted “to continue talking ... about what had happened.” The detective testified that they then “went over this a little more.” As the detectives further questioned her, Aldridge began to describe in detail the events and for the first time “basically came to a point where she stated that, in fact, when she gave birth, that the baby was moving.” After the detectives “went over this a little more, [they] actually put on a tape recorder and advised her again that [they] were just going to take a taped statement of what she had already told [them].” Later, Aldridge signed a transcription of the taped statement.
On this evidence, “there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.” Seibert, - U.S. at-, 124 S.Ct. at 2610. Put simply, the “standard procedure” the detectives used to extract the statement from Aldridge “is designed to circumvent Miranda.” Id. at-, 124 S.Ct. at 2614 (Kennedy, J., concurring). By any objective measure, Aldridge’s statements were made without proper Miranda warnings and are inadmissible as evidence. Dean v. Commonwealth, 209 Va. 666, 667-68, 166 S.E.2d 228, 230 (1969). I would hold that the technique the detectives used violated Miranda, that the warnings were ineffective, and that the trial judge erred in admitting Aldridge’s confession.
II.
The principle is well established that, in every criminal prosecution the Commonwealth must prove beyond a reasonable doubt the element of corpus delicti [“that is, the fact that the crime charged has actually been perpetrated”] and the accused was the person who committed the crime. Maughs v. City of Charlottesville, 181 Va. 117, 120, 23 S.E.2d 784, 786 (1943). Thus, in any prosecution for the killing of a newborn baby, the Commonwealth must prove beyond a reasonable doubt (1) that the baby was born alive, (2) that the baby achieved an independent and separate existence from its mother, (3) that the baby died as a result of a criminal act, and *666 (4) that the accused was the criminal agent. Lane v. Commonwealth, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978); Vaughan v. Commonwealth, 7 Va.App. 665, 671, 376 S.E.2d 801, 804 (1989).
Equally well established is the principle that an accused cannot be convicted solely upon her uncorroborated extrajudicial confession. Phillips v. Commonwealth, 202 Va. 207, 210-11, 116 S.E.2d 282, 284 (1960). Although “[t]he Commonwealth need not corroborate an entire confession, ... it must corroborate the elements of the corpus delicti.” Roach v. Commonwealth, 251 Va. 324, 344, 468 S.E.2d 98, 110 (1996). In addition, “[t]he confession must be corroborated ... by evidence aliunde of the corpus delicti.” Phillips, 202 Va. at 211, 116 S.E.2d at 284. See also Roach, 251 Va. at 344, 468 S.E.2d at 110 (finding that the corpus delicti “was ... corroborated by evidence independent of [the] confession”); Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989) (holding “that there must be independent corroboration of ... the facts constituting the corpus delicti ”). Thus, even when the accused has fully confessed, the Commonwealth must still produce “slight evidence to establish the corpus delicti.” Lucas v. Commonwealth, 201 Va. 599, 603, 112 S.E.2d 915, 918 (1960). Accord Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999).[5]
The Commonwealth failed to corroborate Aldridge’s confession by evidence from another source of the corpus delicti. Dr. Elizabeth Kinnison, the assistant chief medical examiner, conducted the autopsy four months after the baby’s birth and testified that the autopsy was limited by the body’s severe decomposition and could not prove the baby drowned. In *667 deed, her testimony established that the autopsy did not point to any cause of death. For example, Dr. Kinnison testified that ordinarily lungs that floated upon being immersed in water is a circumstance that indicates a baby was breathing at birth. In this case, however, although the baby’s lungs floated, Dr. Kinnison testified, she “would have expected them to float from decomposition. So that doesn’t help ... in determining whether the baby was born alive or dead.” She further testified: “If for example a baby was found and looked just like this baby, no, I would not have been able to determine what the cause of death was.” Indeed, Dr. Kinnison testified, that she “never [found] anything specific to drowning” and that “the autopsy alone doesn’t exclude drowning. It’s consistent with drowning but it could be something else.”
Despite these autopsy limitations, Dr. Kinnison opined that the baby died as a result of drowning. She testified, however, that her opinion was based on two sources, Aldridge’s confession and the inconclusive autopsy. In part, she testified as follows:
Q. Now isn’t it fair to say there was nothing obvious about this baby’s body that on its own told you that it had drowned from finding water in the lungs or anything that you found on the body during the autopsy?
A. Physically, because the baby was so decomposed, it was difficult to determine anything apart from that I didn’t find any injuries, the baby looked fully formed, it looked like full term baby.
Q. So it is fair to say that without what information was provided by the police, you can’t say how the baby died? A. In this case, that’s fair to say.
Q. So there is really no cause of death that you can determine from the autopsy, but rather you indicate a cause of death based on what information was provided by the police; is that correct?
A. Well, I commonly have to take into account other information in addition to my autopsy finding to determine a cause of death.
*668 Q. Now, you can’t say whether or not the baby was born alive based on your autopsy?
A. Based just solely on the autopsy, no, I cannot.
Most significantly, Dr. Kinnison concedes in her own testimony that in the absence of Aldridge’s statement to the police, her autopsy and investigation would have led her to the conclusion that “the cause of death was undetermined.”
Dr. Kinnison, therefore, only provided speculative testimony regarding the corpus delicti. Her ability to provide corroborating evidence was further limited because, as she frankly admitted during her testimony, obstetrics is outside her area of expertise. She testified: “I don’t know a whole lot about delivering babies. So this is just a little bit beyond my area of expertise.” Because of this lack of expertise, she could not form an opinion about why the baby did not cry or make other sounds after birth. When questioned about the baby’s failure to cry, Dr. Kinnison testified, “These are probably questions that would be better asked to an obstetrician who actually delivers children and sees them right at the birthing process.” Similarly, she could not identify the significance of the baby’s bluish color at birth, and whether the baby’s color indicated the baby was alive, dead, or suffering and dying from anoxia due to blocked air passages. She testifies quite plainly that it was “within the realm of possibility that the baby died from some undetermined anoxic event,” a condition about which she knows quite little. The lack of meaningful results from the autopsy underscores what is obvious from the transcript: Dr. Kinnison merely relied upon and repeated Aldridge’s confession that the baby drowned as a result of being submerged in the bath.
The trial judge’s questions provide a brief overview of Dr. Kinnison’s testimony.
Q. The reasonable degree of medical certainty you’re relying upon is the confession given by the defendant. You determined that this child first of all born alive, and secondly, died as a result of drowning?
A. Yes.
*669 Q. And it is within acceptable standards to utilize those factors as part of your determination as to what the cause of death was in this particular case?
A. Yes.
Q. If you were given information that the baby was born stillborn and arms and legs were not moving, and you still had the same physical findings as you report on this report of autopsy, the result would have been — in terms of a finding?
A. I would have said undetermined. I can’t tell whether the baby died in útero. It could have died during the birthing process. It could have been drowned in the toilet. It could have been smothered.
Q. So in essence, the finding survived or faded based upon the confession?
A. In combination with the fact that I have a normal, although, decomposed baby.
Q. Because there’s nothing inconsistent with that confession within this report?
A. There’s nothing inconsistent.
Q. There are some things which are consistent with it?
A. Yes. There was a full term baby and was moving.
* * # :j« sj« %
THE COURT: Just one question I need to ask you. Let me ask you this.
But for the statement made by the defendant, you wouldn’t know if this baby was born alive?
THE WITNESS: That’s correct.
To corroborate means “to support or confirm by new evidence.” Am. Heritage Dictionary (2nd ed. Houghton Mifflin 1991). “Corroborating evidence” is evidence that “differs from but strengthens or confirms other evidence.” Black’s Law Dictionary, (West 7th ed.1999). The corroboration requirement exists to establish the accused’s guilt beyond a reasonable doubt. In Aldridge’s ease, proper corroboration would have confirmed that placing the baby in the bathtub led *670 to the baby’s death, and not that it died from “some undetermined anoxic event.” Because no determinations flowed from the autopsy, the “corroboration” in this case was simply a repetition of Aldridge’s statement. Obviously, Dr. Kinnison’s reliance on Aldridge’s confession to support her conclusion of drowning is not corroboration of the confession. The logical fallacy of relying on Dr. Kinnison’s testimony is summarized in Grimes v. State, 204 Ga. 854, 51 S.E.2d 797, 801 (1979): “To hold that a confession, in the absence of independent evidence to establish the corpus delicti, could be used to itself establish the corpus delicti, would necessarily have the effect of ruling that a person could be convicted on his uncorroborated confession, by simply using the confession to corroborate the confession.”
Another difficulty with accepting Dr. Kinnison’s testimony as “corroborating evidence” is that it does not support a finding that criminality caused the baby’s death. The Supreme Court of Washington confronted this same issue in State v. Aten, 130 Wash.2d 640, 927 P.2d 210 (1996), where a defendant confessed to suffocating a four-month-old infant she was babysitting and was convicted of manslaughter. 927 P.2d at 218. The State sought to rely on an inconclusive autopsy to corroborate the defendant’s confession. The doctor who performed the autopsy could not determine from the autopsy whether the baby’s acute respiratory failure was caused by Sudden Infant Death Syndrome or by suffocation. Id. at 220. Noting that this evidence proved the baby’s death could have been from either cause, the court held “there was insufficient evidence independent of [the defendant’s] statements to establish the corpus delicti.” Id. at 221. As in Aten, the autopsy and Dr. Kinnison’s testimony provide no basis upon which to infer criminality.
Dr. Kinnison’s inability to draw meaningful conclusions from the autopsy, to identify drowning as the cause of death, and to rule out anoxia as a possible cause of death highlights the fact that her determination that the baby drowned was based on Aldridge’s account alone and her own speculation. Her testimony was not based on her analysis of corroborative evidence *671 and did not provide corroborative evidence. The record is devoid of even slight corroboration of the confession “by evidence aliunde of the corpus delicti.” Phillips, 202 Va. at 211, 116 S.E.2d at 284.
As in this case, the baby in the Lane case was born full term without birth defects. There, the doctors expressly found that it was “pure speculation” that the baby died as a result of being placed in a plastic bag. Lane, 219 Va. at 512, 248 S.E.2d at 782. Dr. Kinnison’s testimony here is of the same quality. She would speculate but for the cause she gleaned from Aldridge’s confession. Because “there is no evidence that fortifies the truth of the confession that the criminal act was committed,” id., the evidence in this case was insufficient to prove beyond a reasonable doubt that the baby was born alive, that the baby had achieved a separate and independent existence, and that the baby died as a result of a criminal act.
For these reasons, I would reverse the conviction.

. The historic rationale for the rule are several: (1) the danger the confession will be misreported or misconstrued, (2) the danger the confession will be untrustworthy because of improper police procedures, (3) the possibility the accused may be mistaken in the confession either as to the law or the facts, and (4) the danger the confession is false because of psychological reasons. See State v. Aten, 130 Wash.2d 640, 927 P.2d 210, 219 (1996) (citing Note, Proof of the Corpus Delicti Aliunde the Defendant’s Confession, 103 U. Pa. L.Rev. 638 (1955)). Several of these factors are implicated by the facts of this case.