# COURT OF APPEALS OF VIRGINIA

## Record No. 2028-24-3

AARON CHRISTOPHER GORDON, JR.

v.

COMMONWEALTH OF VIRGINIA

Present: Judges O'Brien, AtLee and Senior Judge Petty

Argued by videoconference

Opinion Issued April 7, 2026[*]

**FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY**
Andrew S. Baugher, Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia Indigent Defense Commission, on briefs), for appellant.

C. David Sands, III, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE RICHARD Y. ATLEE, JR.

Following a jury trial, the trial court convicted Aaron Christopher Gordon, Jr. of voluntary manslaughter. The court sentenced Gordon to ten years of incarceration and three years of post-release supervision. The court also ordered that Gordon waive his Fourth Amendment rights as a condition of his post-release supervision. Gordon raises two arguments on appeal. First, Gordon argues that the evidence is insufficient to support his conviction. Next, he contends that the waiver of his Fourth Amendment rights was unreasonable. We disagree and affirm the trial court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

## I. BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth," the prevailing party below. *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

Around 11:00 p.m. on August 13, 2022, Gordon and Towan Cappell arrived at William Harris's Charlottesville residence. There, they consumed alcohol and marijuana. About two hours later, Gordon and Cappell left Harris's house together.

Cell tower records showed that, after leaving Harris's, Cappell's phone traveled to an area in Harrisonburg, near where his body was later discovered. The phone did not connect with any other cell towers after that time, and it was never recovered. From around 1:00 a.m. until about 4:30 a.m., Gordon's phone did not connect with any cell towers. His phone subsequently connected to a cell tower in an area where police later discovered that Gordon had burned his clothes.

On August 15, Gordon had purchased some gasoline and used it to burn items of his clothing and shoes on the side of a road. Sherry Croy, who was in a car stopped behind Gordon, saw the fire and called 911. When Gordon left the scene of the fire in a car driven by Antwaun Martin, Croy photographed the license plate. Rockingham County Sheriff's Deputy Rainard responded to the 911 call. When he arrived on scene, he collected the partially burned clothing, and he observed what appeared to be blood stains on the clothing.

After testing confirmed the stains were blood, Rainard researched the license plate Croy photographed, and he went to the address on the vehicle's registration. A person at that address directed Rainard to Gordon and Martin, who were in a nearby parking lot. Gordon initially denied that he had burned any clothing, but he admitted to it after Rainard showed him the photos Croy had taken. When asked why he burned the clothes, Gordon "stated that it was some

bullshit" and that "he didn't want them anymore." Martin initially told Rainard that Gordon said he needed to burn the clothes because he vomited on them. Later, he admitted that Gordon said he needed to burn them because he had gotten into a fight. Martin was not concerned that Gordon burned the clothes until he noticed Gordon acting "very quiet" after that day. Police later submitted the burned clothing for DNA testing, which revealed that the blood on Gordon's clothing belonged to Cappell.

After August 14, Gordon did not make any attempt to contact Cappell. And, in the early morning hours of August 15, Gordon removed Cappell from his friend list on Snapchat.[2] That same day, Harris sent a text message to Gordon stating that he needed to get in touch with Cappell. Gordon responded that he did not "know what's going on" and that he was unable to get in touch with anyone. Despite never attempting to contact Cappell, when Harris again asked if Gordon had been able to get in contact with Cappell, Gordon answered that he had not and that his calls were "go[ing] to voicemail." During this time, Gordon also made a call to Jaden Martin, who was then an inmate at Middle River Regional Jail. On the call, Gordon stated that he needed "to lay low" and that he "need[ed] a lawyer."[3]

Cappell's mother reported him missing on August 16. On August 18, two construction workers noticed an odd odor in a gravel parking lot near their job site and, upon investigating, they found Cappell's "very decomposed" body. The men then called the police. On August 20, Cappell's mother accompanied police to the crime scene, and she found a portion of Cappell's scalp and some of his teeth. The police also discovered a trail of blood between the location of

_____

[2] Snapchat is a social media application that allows users to communicate through photo, video, and text.

[3] Additionally, in October 2022, Gordon posted a video to his Facebook account in which, while speaking about what happens if you cross him, he stated, "Ask the last [person] what happened, you can't."

Cappell's body and a rock pile nearby. There, they found rocks and a plastic top to a can of spray paint, both with Cappell's blood on them. Cappell's mother returned to the scene again on August 29 and recovered more of Cappell's teeth and a portion of his jawbone.

Due to the decomposition of Cappell's body, the medical examiner was unable to determine the exact cause of Cappell's death. The medical examiner ordered a toxicology report, which revealed that Cappell had fentanyl, methamphetamine, and amphetamine in his system when he died. But Cappell also suffered "Le Fort fractures type I and III" to his face from being struck with blunt force. The medical examiner explained that Le Fort fractures can produce subdural hemorrhages and spinal injuries, which could easily cause death especially without immediate medical attention. A forensic anthropologist concluded that Cappell's facial injuries likely came from a single blow with a heavy, flat surface, such as a flat rock or a cinderblock. Due to the decomposition of his body, the medical examiner was unable to determine whether Cappell suffered the fractures to his head before or after his death. Although unlikely, Cappell's injuries could have resulted from him losing consciousness and falling onto a flat rock. The circumstances, however, were "strongly suggestive of homicide."

At the time of his death, Cappell struggled with addiction. He had previously been convicted of drug distribution, and he was still involved in the drug trade. Cappell often owed people money and "was bad about paying people back." Before his death, Cappell owed Gordon money. Gordon had attempted to collect on this debt.[4] Because of this, Cappell had been avoiding Gordon.

_____

[4] Several months before Cappell died, Gordon contacted Cappell's brother, Juleian, about the debt. Additionally, a few weeks before Cappell died, Gordon asked Earl Bolden to lure Cappell into a car using drugs so that Gordon could ambush Cappell about the debt and beat him up. Gordon later told Bolden that he attempted to fight Cappell at a residence, but he was unsuccessful because Cappell walked out holding a baby "so [Gordon] didn't do anything to him."

Eventually, a grand jury indicted Gordon on one count of first-degree murder. In March 2024, the trial court granted Gordon bail, subject to certain conditions. In June 2024, the court convicted Gordon of violating the conditions of his bail after Gordon tested positive for marijuana and possessed a firearm in his home.

At trial, at the conclusion of the Commonwealth's case-in-chief, Gordon made a motion to strike the evidence. He argued that the evidence was insufficient because the Commonwealth's medical experts were unable to rule out an accidental overdose as Cappell's cause of death. The trial court denied the motion. Gordon renewed the motion to strike at the conclusion of the evidence, and the court again denied the motion. Ultimately, the jury found Gordon guilty of voluntary manslaughter.

At sentencing, the trial court imposed ten years of active incarceration and three years of post-release supervision. Over Gordon's objection, the court also ordered him to waive his Fourth Amendment rights while on post-release supervision. The court found the waiver was necessary based on the violent nature of the offense, the "testimony that [the offense] may have implicated an illicit drug trade," Gordon's attempt to destroy evidence, and his violations of his pretrial conditions. Gordon now appeals.

II. ANALYSIS

A. *The evidence was sufficient to sustain Gordon's voluntary manslaughter conviction.*

Gordon contends that the trial court erred when it denied his motion to strike. Specifically, he argues that the evidence was insufficient to prove the corpus delicti. In other words, Gordon argues that there was insufficient evidence to establish that the death was caused by a criminal act.[5] We disagree.

---

[5] *See Aldridge v. Commonwealth*, 44 Va. App. 618, 648 (2004) ("[T]he *corpus delicti* is the fact that the crime charged has been actually perpetrated." (quoting *Lucas v. Commonwealth*, 201 Va. 599, 603 (1960))).

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). The only relevant question for this Court on review "is, 'upon review of the evidence in the light most favorable to the prosecution, "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Id.* (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017)).

"Voluntary manslaughter is the unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016) (quoting *Wilkins v. Commonwealth*, 176 Va. 580, 583 (1940)). "The Commonwealth must prove, as an essential element of its case, that the victim's death resulted from the criminal agency of the defendant." *Commonwealth v. Presley*, 256 Va. 465, 470 (1998). While "[d]eath must be proved either by direct testimony or by presumptive evidence of the strongest kind[,] . . . the existence of the criminal agency as the cause of the death and the identity of the agency may be established by circumstantial evidence." *Id.* (first alteration in original) (quoting *Bowie v. Commonwealth*, 184 Va. 381, 390 (1945)). This reflects the principle that "[a]n examination of the body of a dead person will not always disclose whether death was from natural causes or by means of violence." *Opanowich v. Commonwealth*, 196 Va. 342, 355 (1954) (quoting *Bowie*, 184 Va. at 390). In other words, "[a]n investigation of the cause of death is . . . not limited to the mere appearance of the body" and "[t]he circumstances surrounding the cause of death may be inquired into." *Id.*

Gordon argues that where, as here, the expert witnesses cannot exclude a non-criminal cause of death, the evidence is insufficient to prove corpus delicti "no matter [what] the other evidence" is. Gordon relies on *Lane v. Commonwealth*, 219 Va. 509 (1978), arguing that the case establishes this bright-line rule. But Gordon's interpretation of the holding in *Lane* is misguided.

In *Lane*, the medical experts opined that a deceased infant died due to lack of oxygen, but they were unable to determine whether the death resulted from natural causes or from criminal agency. *Lane*, 219 Va. at 512. There, the Court recognized the uncertainty of the medical testimony but analyzed whether the other circumstantial evidence was nonetheless sufficient to support an inference that the defendant caused the infant's death by some criminal act. *Id.* at 515. Although the Court ultimately concluded that the circumstantial evidence was insufficient there, *Lane* indicates that, where medical evidence cannot conclusively establish criminal agency as the cause of death, the issue becomes a question of whether the other circumstantial evidence supports the inference of such cause. *Id.* Thus, contrary to Gordon's assertion, *Lane* does not establish a bright-line rule that the evidence is insufficient to the prove the corpus delicti, regardless of *all* other evidence in a case, if the medical experts cannot rule out a non-criminal cause of death.

Here, the circumstantial evidence was sufficient to permit the factfinder to infer that Cappell's death was not an accident. Expert testimony established that the manner of Cappell's death was consistent with a homicide. Cappell's head collided with a rock or other flat object with such force that his face was dislodged. He suffered fractures which, according to the medical examiner, can produce subdural hemorrhages and spinal injuries that could easily cause death, particularly without immediate medical attention. The forensic anthropologist reported that it was unlikely that these fractures resulted from Cappell losing consciousness and falling onto a rock. And the medical examiner indicated that the "circumstances of the case are strongly

suggestive of homicide." The record thus supports a finding beyond a reasonable doubt that Cappell's death was caused by criminal agency.

Further, the evidence established Gordon as the criminal agent. Gordon and Cappell were together in the hours leading up to Cappell's death. They left a gathering at the same time. Cappell's phone then travelled to the crime scene, while Gordon's phone did not communicate with a cell tower for several hours, suggesting it had been turned off. When Gordon's phone did ping, it was at the location where he attempted to burn his clothing, which was stained with Cappell's blood. Further, Gordon initially lied to the police about burning his clothing.

Gordon also removed Cappell from his friend list on Snapchat shortly after Cappell died, but before his body was discovered. He never attempted to contact Cappell's phone after Cappell died. Despite this, when Harris asked Gordon if he had heard from Cappell, Gordon lied and said his calls to Cappell were "go[ing] to voicemail." *See Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) ("[I]n drawing inferences from the evidence, the fact finder may conclude regarding even a non-testifying defendant that his false statements establish that he has lied to conceal his guilt."). And several witnesses, including Cappell's brother, testified that, prior to Cappell's death, they heard that Cappell owed Gordon money. *See id.* at 30 ("[M]otive is among the types of circumstantial evidence that may be used to establish both that a death was not the result of natural causes and that it was caused by the defendant."). The circumstantial evidence, viewed as a whole, was sufficient to support the inference that Cappell's death resulted from the criminal agency of Gordon. Accordingly, the trial court did not err.

B. *The trial court did not abuse its discretion by ordering Gordon to waive his Fourth Amendment rights for the duration of his post-release supervision.*

Gordon complains that the imposition of the Fourth Amendment waiver as a condition of his post-release supervision was unreasonable. We disagree.

"[A] sentencing court has broad discretion to impose reasonable special conditions of probation and suspension that are tailored to the unique circumstances of a case." *Commonwealth v. Delaune*, 302 Va. 644, 657 (2023). As such, "[w]e review conditions of probation imposed by a trial court as part of its sentencing determination for abuse of discretion." *Murry v. Commonwealth*, 288 Va. 117, 122 (2014). "Probation conditions must be reasonable in light of the nature of the offense, the defendant's background, and the surrounding circumstances." *Id.* "Because the probation condition here implicates [Gordon's] Fourth Amendment rights, to determine whether it is reasonable we must measure [Gordon's] privacy interests against the Commonwealth's interests in imposing the condition in light of [Gordon's] offenses, his background, and the surrounding circumstances." *Id.* at 123.

Applying that standard here, we conclude that the waiver was reasonable. Unlike in *Murry*, where the duration of the Fourth Amendment waiver was indefinite, the waiver imposed here has a defined duration of three years. *Id.* at 121. The trial court explained its reasoning for imposing the waiver, emphasizing the violent nature of the offense and Gordon's criminal history, which included acts of violence and drug-related crimes. Further, Gordon demonstrated his unwillingness to obey court orders by using marijuana and possessing a firearm despite the clear prohibition of such conduct while he was awaiting trial. The waiver was reasonable in light of these circumstances and, accordingly, the trial court did not abuse its discretion by imposing it.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*